In re Referendum Petition to Amend the
CITY OF PITTSBURGH HOME
RULE CHARTER.

Marshall W. Hynes, President, Fraternal
Order of Police, Fort Pitt Lodge
No. 1.

Linda Wambaugh, Sala Udin, Jim Ferlo,
Valerie McDonald, and Dan Cohen.

Marshall W. Hynes, President, Fraternal
Order of Police, Fort Pitt Lodge
No. 1, Appellant.

Commonwealth Court of Pennsylvania.

Argued May 8, 1997.
Decided May 12, 1997.

Karen M. Balaban, Harrisburg, for appellant.

Ira Weiss and Paul H. Girdany, Pittsburgh, for appellees.

Before COLINS, President Judge, and FRIEDMAN, J., and LORD, Senior Judge.

FRIEDMAN, Judge.

Marshall W. Hynes (Hynes), President of the Fraternal Order of Police, Fort Pitt Lodge No. 1, appeals from an order of the Court of Common Pleas of Allegheny County (trial court) which dismissed his Petition to Set Aside the Referendum Petition (Petition) and directed that the Allegheny County Elections Department (Elections Department) include on the May 20, 1997 primary ballot the referendum question presented on the Referendum Petition.

The Referendum Petition, which was filed on February 18, 1997, proposed an amendment to the City of Pittsburgh (City) Home Rule Charter as follows:

#### Question

"Shall the City of Pittsburgh Home Rule Charter be amended by adding the following sections to Article Two?"

228. *Independent Citizen Review Board.* There is established an Independent Citizen Review Board, composed of seven members reflecting Pittsburgh's diversity, for the purpose of receiving, investigating and recommending appropriate action on complaints regarding police misconduct and for the purpose of improving the relationship between the police department and the community. The members shall serve four year staggered terms and serve until the appointment of their successors. Four of the seven appointments shall be made from a list of nine nominations submitted to the Mayor by City Council. Members shall be residents of the City, shall not be employed by the City or any of its Authorities, and shall serve without compensation.

229. *Powers of Independent Citizen Review Board.*

The Board shall:

● Investigate selected complaints filed by individuals alleging police misconduct;

● Establish a mediation program pursuant to which a complainant may voluntarily choose to resolve a complaint by means of informal conciliation;

● Provide advice and recommendations to the Mayor and Chief of Police on policies and actions of the Police Bureau, including recommendations on police training, hiring and disciplinary policies and specific recommendations of discipline for individual officers; provided, however, the Mayor and the Chief of Police shall retain full and ultimate authority to set disciplinary policies or take other actions deemed appropriate relative to the Police Bureau.

● Hold public hearings, subpoena witnesses and compel their attendance, administer oaths, take the testimony of any person under oath and in connection therewith require the production of evidence relating to any matter under investigation or any questions before the Board and do all other things necessary to fulfill its purpose.

The Board shall employ and supervise a staff including a solicitor, as necessary. The Board shall adopt procedures and rules necessary to fulfill its purpose. City Council may by ordinance adopt regulations to effectuate this Charter provision.

230. *Response to Recommendations of Independent Citizen Review Board.* Within thirty (30) days of submission of a rec-

ommendation by the Board to the Mayor and the Chief of Police, they shall respond in writing as to whether such recommendations are accepted, rejected or will be implemented with modifications.

In order to have the referendum question placed on the May 20, 1997 primary ballot, the Referendum Petition needed 10,339 valid signatures.[1] The Referendum Petition consisted of 637 pages and contained 17,524 signatures.

Hynes subsequently filed his Petition challenging the validity of thousands of signatures.[2] Linda Wambaugh, Sala Udin, Jim Ferlo, Valerie McDonald and Dan Cohen (Intervenors) intervened in the matter and argued that the Referendum Petition contains a sufficient number of valid signatures to justify its placement on the May 20, 1997 primary ballot. Intervenors voluntarily withdrew 727 signatures from the Referendum Petition, leaving what they believed to be 16,797 valid signatures.

The trial court held hearings, and the Elections Department reviewed Hynes' challenges. The parties stipulated that they would accept the Elections Department's determination after its review. (N.T. at 216–17.) Based on the evidence presented at the hearings and the Elections Department's findings,[3] the trial court: (1) struck 3,212 signatures because the signers were not qualified electors as set forth in Hynes' Exhibit 1;[4] (2) struck 437 signatures because the signers did not reside in the City as alleged in Hynes' Exhibit 2;[5] (3) struck 225 signatures because the signers printed their names rather than signing them as they did on their voter registration cards pursuant to Hynes' Exhibit 3;[6] (4) struck 559 signatures because the information was

1. This number represents 10% of the number of electors voting for the office of Governor in the last gubernatorial election in the municipality. *See* 53 Pa.C.S. § 2943.

2. Hynes objected on the following grounds: (1) certain signers were not valid registered electors in the City; (2) certain signers do not reside in the City; (3) certain signatures were printed and do not conform with the signatures on the voter registration cards; (4) certain signatures and the corresponding place of residence are illegible; (5) certain signatures were duplicates of others; (6) certain "circulators" were not the actual circulators of the Referendum Petition; (7) certain signatures are not genuine; and (8) certain signers omitted their occupations or failed to complete their places of residence or other information.

3. The Elections Department provided the trial court with coded copies of certain exhibits to Hynes' Petition. Each challenge on the exhibit contained one of the following codes:

Exhibit 1 (signer not qualified elector)
A: Signator registered at address on petition
B: Only one person registered by that name in City
C: Multiple persons registered by that name at different addresses in City
Exhibit 2 (signer not in City)
D: Address listed is within City
Exhibit 3 (signer printed signature)
E: Printed signature on petition matches printed signature on registration card
Exhibit 4 (not legible/not registered)
Same as Exhibit 1 plus:
G: Registered out of City

H: Can read signature on petition but not registered
-: challenge accepted
x: challenge withdrawn

4. The trial court determined that: (1) 894 signatures were registered to vote at the stated address (Code A); (2) 787 signers were registered to vote, but the addresses on the Referendum Petition did not match that on the voter registration card (Code B); (3) the identity of 308 signers could not be determined because more than one person by the same name was registered to vote in the City and the address on the Referendum Petition did not match any of the voter registration cards (Code C); and (4) 2,904 signatures were not those of registered voters (Code-). (Elections Department Finding, Coded Exhibit 1.) The trial court struck signature lines with a Code C and a Code-.

5. Objectors challenged 1236 signatures; however, the trial court adjusted the figure to 802 to eliminate signatures already stricken under another category. The trial court determined, based on the Elections Department review, that 365 voters were registered within the City limits (Code D). (Elections Department Finding, Coded Exhibit 2.)

6. Objectors challenged 641 signatures because they were printed. However, the trial court adjusted the figure to 270 because some had been disqualified on other grounds. The Elections Department found that 45 of the 270 printed signatures matched the printed signature on the voter registration card. (Elections Department Finding, Coded Exhibit 3.)

illegible as averred in Hynes' Exhibit 4;[7] (5) struck 121 signatures because the names were duplicates as set forth in Hynes' Exhibit 5;[8] and (6) struck 178 signatures because they were not genuine.[9] Subtracting the 4,732 successful challenges from the 16,797 total signatures, the trial court concluded that the Referendum Petition contained 12,065 valid signatures. Because that number exceeds the 10,339 signatures necessary to place the referendum question on the May 20, 1997 primary ballot, the trial court dismissed Hynes' Petition.

## I.

■ On appeal to this court, Hynes first argues that circulator Wambaugh did not possess the requisite knowledge regarding the information contained in the Referendum Petition; thus, the trial court should have stricken 22 additional signatures.[10] We disagree.

7. Objectors challenged 1692 signatures; however, because some of these had been disqualified on other grounds, the number was reduced to 750. The trial court found that 559 of the 750 signatures were illegible. (Elections Department Finding, Coded Exhibit 4.)

8. Objectors challenged 166 signatures. However, the parties ultimately concluded that 144 were duplicates. Adjusting this figure for signatures already disqualified on other grounds, the trial court found that 121 signatures should be stricken.

9. The trial court made this determination based on evidence presented at the hearing.

10. Section 909 of the Election Code, Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. § 2869, requires, *inter alia*, that the circulator have knowledge that each signer signed with full knowledge of the contents of the petition, that the residences are correctly stated, that each signed on the date opposite the name, and that, to the best of affiant's knowledge and belief, the signers are qualified electors.

11. Wambaugh's document sets forth the following relevant guidelines:

(1) DO qualify each signer with—"Are you a registered voter in the City of Pittsburgh?"
(2) DO stand by the person, explain the process, and make sure they complete all sections correctly.

■ Although Wambaugh did not personally obtain the 22 signatures challenged by Hynes, the Election Code does not require the individual who actually circulates the petition to make the required affirmation; the affiant, however, must have knowledge of the qualifying facts enunciated in section 909 of the Election Code. *In re Street,* 115 Pa. Cmwlth. 189, 539 A.2d 923 (1988). Here, Hynes acknowledges that Wambaugh prepared a document known as "Petitioning Do's and Don'ts" and was one of the principal persons responsible for training the volunteers who actually circulated the petition and obtained the signatures.[11] We believe that Wambaugh's role as trainer and supervisor gave her sufficient knowledge of the qualifying facts of section 909 of the Election Code. Thus, we decline to strike an additional 22 signatures from the Referendum Petition.

## II.

■ Hynes next argues that the trial court should have stricken 787 signatures pursuant

(3) DO MAKE SURE CIRCULATOR IS A REGISTERED VOTER IN THE CITY OF PITTSBURGH.
(4) DO BE CERTAIN ALL BLOCKS ARE FILLED IN.
(5) DO MAKE SURE SIGNER IS A REGISTERED VOTER IN THE CITY OF PITTSBURGH.
(6) DO MAKE SURE SIGNATURE IS THE SAME AS THE REGISTERED NAME.
(7) DO MAKE SURE SIGNATURE IS "SIGNED"—NO PRINTING.
(8) DO MAKE SURE ADDRESS OF SIGNER IS THE SAME AS ON FILE AT THE ELECTIONS DEPARTMENT. IF SIGNER HAS MOVED AND HAS NOT YET CHANGED ADDRESS WITH THE ELECTIONS DEPARTMENT, THE SIGNER NEEDS TO RECORD OLD ADDRESS OR CHANGE ADDRESS WITH VOTER REGISTRATION (VR) FORM AND TURN IT IN IMMEDIATELY.
(9) DO MAKE SURE OCCUPATION SPACE IS FILLED IN. "UNEMPLOYED," "HOMEMAKER," "RETIRED," AND "STUDENT" ARE OK.
(10) DO MAKE SURE DATE IS FILLED IN AND DATES MUST BE IN CHRONOLOGICAL ORDER. OUT OF SEQUENCE DATES WILL INVALIDATE THE OUT OF SEQUENCE SIGNATURE.
In addition, Wambaugh testified that the circulator's responsibilities are "to explain to those being solicited what the petition is in relation to, what it is about, and to determine as best we can whether they are registered voters in the City of Pittsburgh." (N.T. at 129.)

to Hynes' Exhibit 1 where the address on the Referendum Petition did not match the address on the voter registration card. We agree.

In *In re Nomination Petition of Wesley*, 536 Pa. 609, 615, 640 A.2d 1247, 1250 (1994) (citations omitted), our supreme court stated:

At the time that a person registers as an elector, he must specifically set forth, under penalty of perjury, information pertaining to his place of residence. The registration process requires that the applicant indicate the street and number of his residence; the location or number of the room, apartment, flat, or floor that he occupies if his residence is a portion only of the house; and the length of his residence in the State or district. Moreover, the Election Code provides that the registration commission shall send inspectors to conduct street canvasses in order to verify the residence of those registered. Clearly, this inspection is intended to maintain the integrity of the election process by insuring that the qualified elector actually resides at the address listed on his voter registration. Absent extraordinary circumstances, a removal notice is required to be filed whenever a qualified elector changes his residence so that his new address comports with the sworn information maintained by the registration commission. Accordingly, ... [this person's] voter registration terminated as a result of his failure to file a removal notice indicating his change of residence.

Likewise, here, where the signers failed to properly notify authorities of a change of address, their voter registrations terminated. Thus, we strike an additional 787 signatures from the Referendum Petition.

### III.

Hynes further argues that, although the trial court struck 559 signatures as illegible pursuant to Hynes' Exhibit 4, the trial court should have stricken 1,230, an additional 671 signatures, because the signers were not properly registered.

Our review of the record indicates that the Elections Department was able to read many of these signatures and/or addresses, and that many of the signers were properly registered. However, with respect to 150 signatures which the trial court did not strike, the address on the Referendum Petition did not match the address on the voter registration card. Thus, based on our conclusion above that the failure to properly notify the authorities of a change of address terminates a voter registration, these 150 signatures must be stricken from the petition.

### IV.

■ Hynes next maintains that the trial court should have stricken 106 signatures where a particular circulator entered "PGH" on the line rather than allowing the electors to write in their municipality; in addition, the trial court should have stricken another 20 signatures where the circulator entered the occupation of the signer. We agree.

In *In re Nomination Petition of Silcox*, 543 Pa. 647, 674 A.2d 224 (1996), our supreme court held that section 908 of the Election Code, Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. § 2868, *requires* the elector who signs a nomination petition to add his or her occupation, residence and date of signing; where someone other than the elector adds such information, the signature is invalid. Thus, the trial court should have stricken 106 signatures because the circulator entered the municipality designation of the signer's address and should have stricken 20 other signatures because the circulator entered the signer's occupation.

### V.

■ Hynes next argues that the trial court should have stricken all pages circulated by John May because the number of signatures disqualified on his pages raises serious questions about the integrity of the circulator's affidavit. We disagree.

In making this argument, Hynes relies upon *In re Shannon*, 132 Pa.Cmwlth. 497, 573 A.2d 638 (1990). In *Shannon*, this court considered whether to permit the candidate to be substituted for an unqualified circulator for certain disputed pages of her nomination petition. Although the candidate had been

present when the circulator was soliciting signatures, we refused to permit the substitution because it was evident from the fact that 29% of the signatures on the candidate's nomination petition were invalid that the candidate did not know the status of the electors appearing on the petition.

Here, we are not asked to decide whether to substitute John May for an unqualified circulator of certain pages of the Referendum Petition. Moreover, we do not believe that *Shannon* requires us to strike *all* of John May's petition pages in their entirety merely because the Elections Department was able to disqualify approximately 20% of the total number of signatures. There is no proof that the remaining 80% of the signatures are not valid, and we decline to invalidate presumptively valid signatures based upon nothing more than the invalidity of similarly-gathered signatures.

## VI.

■ Hynes also contends that we must remand this case because the trial court failed to identify with specificity the signature lines that were stricken. We decline to do so for the following reason.

To preserve an issue for appeal, Hynes must allege with specificity the errors of the trial court. Like this court, Hynes had available the Elections Department's coded exhibits, which the trial court used to calculate its figures. Thus, Hynes had a burden to examine those same documents and determine whether the trial court erred in its calculations. In failing to examine the record and state the trial court's errors with specificity, Hynes waived any issue arising from the trial court's results.

## VII.

■ Finally, Hynes argues that the trial court erred in allowing Intervenors to amend the Referendum Petition. The record indicates that Intervenors amended the Referen-

dum Petition to add the missing address of a circulator and the missing seal of a notary. We note, however, that Hynes never raised such challenges to the Referendum Petition; thus, these issues have not been properly preserved and we need not consider them.

Having reviewed Hynes' challenges on appeal to this court, we have determined that the trial court should have stricken an additional 1,063 signatures.[12] After the trial court's deductions, the Referendum Petition contained 12,065 valid signatures. After our further reductions, the Referendum Petition contains 11,002 valid signatures, which is 663 more than the 10,339 required for placement of the referendum question on the May 20, 1997 primary ballot. Accordingly, we affirm the dismissal of Hynes' Petition and direct that the Allegheny County Elections Department include on the May 20, 1997 primary ballot the referendum question presented on the Referendum Petition.

## *ORDER*

AND NOW, this 12th day of May, 1997, the order of the Court of Common Pleas of Allegheny County, dated April 8, 1997, is affirmed. We further direct the Allegheny County Elections Department to include on the May 20, 1997 primary ballot the referendum question presented on the Referendum Petition.

---

12. This total is derived from the 787 signatures on Exhibit 1, where the address on the Petition did not match that on the voter registration card; plus 150 signatures from Exhibit 4, where the information was legible but the address on the Petition did not match the one on the voter registration card; plus 126 signatures where the circulator improperly filled in the signer's municipality designation or occupation.