17 A.3d 357

In re Nomination Petition of Lawrence M. FARNESE, Jr., for the Democratic Nomination for Senator in the General Assembly for the First Senatorial District in the Primary of April 22, 2008

**Appeal of Keith Olkowski and Theresa A. Paylor.**

Supreme Court of Pennsylvania.

Argued April 15, 2009.

Decided March 29, 2011.

544

546

Samuel C. Stretton, Law Office of Samuel C. Stretton, West Chester, for Keith Olkowski.

David J. Montgomery, Clifford B. Levine, Pittsburgh, Thorp Reed & Armstrong, LLP, for Lawrence M. Farnese, Jr.

Louis Lawrence Boyle, PA Department of State, for Pennsylvania Department of State.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

### OPINION

Chief Justice CASTILLE.

Appellants are unsuccessful objectors to the nomination petition of a candidate for office, who appeal the Commonwealth Court's decision to award costs of litigation to the candidate pursuant to Section 977 of the Election Code ("Section 977" or "cost-allocation provision").[1] For the reasons that follow, we reverse.

On February 11, 2008, Lawrence M. Farnese, Jr., ("candidate") filed with the Secretary of the Commonwealth a petition for participation in the April 2008 primary election to secure the Democratic Party nomination for the office of Senator in the General Assembly from the First District ("nomination petition"). The nomination petition contained forty-nine signature pages, affidavits from eighteen circulators, and the candidate's affidavit.[2] The candidate submitted a

---

1. *See* 25 P.S. § 2937. In relevant part, Section 977 provides: "the court shall make such order as to the payment of the costs of the proceedings, including witness fees, as it shall deem just."

2. *See* 25 P.S. §§ 2869, 2870. In relevant part, Section 909 of the Election Code, 25 P.S. § 2869, states that a "nomination petition may be on one or more sheets," and "[i]f more than one sheet is used, they shall be bound together when offered for filing if they are intended to

total of 1,778 presumptively valid signatures, well over the five hundred signatures required to be placed on the ballot in the Democratic Party primary election pursuant to Section 912.1 of the Election Code.[3]

On February 21, 2008, appellants Keith Olkowski and Theresa A. Paylor ("objectors")—registered Democrats residing in the First District—filed an action in the original jurisdiction of the Commonwealth Court to set aside the nomination petition pursuant to Section 977 of the Election Code ("objectors' petition").[4] The objectors alleged that over 1,500 of the signatures from the nomination petition were invalid and, therefore, the candidate submitted "at most 278 [valid] signatures" and failed to meet the statutory requirement for appearing on the ballot. The objectors' main claims were the following:

— Individual signatures should be stricken because: voter's signature was written by another, voter's signature did not conform to signature in voter registration file, voter signed twice, voter was not a registered Democrat, voter's address was invalid/nonexistent, voter did not provide address, voter resided at different address,

constitute one petition." "Each sheet shall have appended thereto the affidavit of the circulator of each sheet" setting forth specific required information discussed *infra* at n. 4. Section 910 of the Election Code, 25 P.S. § 2870, describes the information that must appear in the affidavit that the candidate is required to file.

3. *See* 25 P.S. § 2872.1(13). Section 912.1 provides, in relevant part:
Candidates for nomination of offices as listed below shall present a nominating petition containing at least as many valid signatures of registered and enrolled members of the proper party as listed below:
. . .
(13) Senator in the General Assembly: Five hundred.

4. *See* 25 P.S. § 2937. Section 977 states, in relevant part:
All nomination petitions and papers received and filed within the periods limited by this act shall be deemed to be valid, unless, within seven days after the last day for filing said nomination petition or paper, a petition is presented to the court specifically setting forth the objections thereto, and praying that the said petition or paper be set aside.... If the court shall find that said nomination petition ... does not contain a sufficient number of genuine signatures of electors entitled to sign the same under the provisions of this act ... it shall be set aside.

voter's signature was obtained under false pretenses, or signature line was altered;

— Individual pages should be stricken because: page was not validly notarized or page had a false circulator's affidavit (in light of many false and/or fraudulent individual signatures); and

— Nomination petition should be stricken in its entirety in view of the pervasive fraud in obtaining individual signatures, the false circulators' affidavits, and the invalid notarization.

Objectors' Petition at 2–4. Shortly after the objectors filed their petition, the Commonwealth Court, per the Honorable Rochelle S. Friedman, issued an expedited case management order setting the deadline for filing stipulations, expert reports, and witness lists for March 3, 2008, and scheduling a hearing on March 6, 2008. At the parties' request, Judge Friedman extended the deadline for submitting stipulations to March 5 and rescheduled the hearing for March 7, 2008, which allowed the parties additional time to negotiate stipulations.

In the interim, both parties filed timely witness lists and expert reports. The objectors submitted an expert report prepared by forensic document examiner William J. Ries and a private investigator's report prepared by Russell Kolins, which detailed the candidate's alleged "fraud" and was supported by affidavits from witnesses who stated that their signatures on the nomination petition had been falsified. In support of his effort to rehabilitate individual signatures, the candidate filed an expert report prepared by document examiner Michelle Dresbold.

On March 5, 2008, the objectors filed proposed stipulations and a brief. According to the objectors' stipulations, the candidate was withdrawing twenty-two signature pages (total of 934 signatures) from the nomination petition and the objectors were abandoning two full-page challenges. The objectors also stated that the parties agreed to the validity or invalidity of selected individual signatures on the remaining twenty-seven pages. The objectors stated that they "reserve[d] the

right to use" any pages withdrawn by the candidate as evidence to challenge individual pages and the entire nomination petition. Objectors' Proposed Stipulation, 3/5/08, at 2.

In the brief accompanying their proposed stipulations, the objectors explained their purported reservation of right, essentially making a "false-in-one, false-in-all" argument. According to the objectors, all of the circulators' affidavits notarized by Jonathan J. Oriole—and the signature pages to which they were attached—had to be stricken because Mr. Oriole had falsely notarized a page (page 33) of the nomination petition. Page 33 was one of the twenty-two pages withdrawn by the candidate; it had been challenged as falsely notarized because someone other than the circulator signed the circulator's name on the affidavit, indeed misspelling the name. Similarly, the objectors also argued for striking all of the affidavits—and the signature pages to which they were attached—of circulators whose pages were withdrawn by the candidate after being challenged on grounds they contained numerous invalid signatures. The objectors sought to call the circulators of the withdrawn pages as witnesses at the March 7th hearing. According to the objectors, given the pervasive irregularities on some signature pages, the circulators of those pages "lied under oath" and, therefore, all the affidavits they signed and the attached signature pages should be deemed invalid. Objectors' Brief, 3/5/08, at 1–2, 5. The objectors conceded that the outcome of their challenge to the candidate's nomination petition would depend on Judge Friedman's rulings on their "false-in-one, false-in-all" theory. Objectors' Proposed Stipulation, 3/5/08, at 2.

In response, on March 6, 2008, the candidate filed his own proposed stipulations regarding the validity of individual signatures, two motions *in limine,* and a motion to strike certain challenges in the objectors' petition. In the motion to strike, the candidate objected to two types of challenges the objectors raised to individual signatures: the "invalid signature" category on grounds of specificity, and the "circulator lives out of district" category on constitutional grounds. Candidate's Motion to Strike, 3/6/08, at 2–6. Via the motions *in limine,* the

candidate sought to preclude the objectors from introducing any evidence related to notary Jonathan J. Oriole, from introducing any withdrawn signature pages into evidence, and from calling individual circulators as witnesses. The candidate argued that the withdrawn pages were no longer part of the nomination petition, should not be accepted into evidence, and were irrelevant to show the invalidity of otherwise presumptively valid signatures involving the same notary public or the same circulators. The candidate also sought to prevent individual circulators from testifying, on grounds of relevancy. He claimed that the only reason the objectors sought to introduce the circulators' testimony was to impeach them with prior bad acts (the irregularities on the withdrawn signature pages), which was impermissible under the Pennsylvania rules of evidence. Candidate's Motion *in Limine* (Notary), 3/6/08, at 1–4; Candidate's Motion *in Limine* (Circulators), 3/6/08, at 2–5.

At the March 7th hearing, the parties reviewed the competing stipulations and of the original 1,778 signatures, 934 were withdrawn by the candidate. In addition, the parties agreed that another 143 signatures were invalid. The objectors then argued to strike 270 of the remaining 701 signatures—several full pages—on the ground that the attached circulators' affidavits were "incorrect or false."

In support of their claim vis-à-vis the 270 signatures, the objectors sought to question the circulators of the withdrawn pages "on their understanding of the basic criteria of their oath and obligations as a circulator as defined by [Section] 909 of the Election Code."[5] According to the objectors, if a

---

5. *See* 25 P.S. § 2869. Section 909 provides, in relevant part:

Each [signature] sheet shall have appended thereto the affidavit of the circulator of each sheet, setting forth—(a) that he or she is a qualified elector duly registered and enrolled as a member of the designated party of the State, or of the political district, as the case may be, referred to in said petition ... (b) his residence, giving city, borough or township, with street and number, if any; (c) that the signers thereto signed with full knowledge of the contents of the petition; (d) that their respective residences are correctly stated therein; (e) that they all reside in the county named in the affidavit; (f) that each signed on the date set opposite his name; and (g) that, to the best of

circulator stated that s/he did not understand or follow the
legal criteria, all of that circulator's signature pages had to be
stricken. If a circulator testified that s/he was aware and
understood the legal criteria of Section 909, then the objectors
wished to impeach his/her credibility with evidence of the
allegedly "fraudulent or false affidavits concerning the [signa-
ture pages] that were withdrawn." N.T., 3/7/08, at 9. The
objectors argued that the affidavits were false, *inter alia,*
because the nomination petition listed residences that did not
exist but were vacant lots, listed group residences/homeless
shelters that were not in operation, and listed signatures of
persons who filed affidavits stating that they never signed the
nomination petition and/or had no reason to provide a particu-
lar shelter as his/her residence. *Id.* at 10–11. The objectors
contended that the withdrawn signature pages showed that
those circulators were not familiar with their "requirements
and obligations;" and if there was fraud or false affidavits with
regard to the withdrawn signature pages, then the circulators'
other pages "should also be withdrawn, because one should
not benefit by fraudulent conduct in the past and then present
other [pages] during the same time period." The objectors
argued that the validity of the circulators' affidavits could not
be taken lightly, especially given the criminal penalties at-
tached to making false statements in nomination petitions. *Id.*
at 13. Finally, as an alternative to their "false-in-one, false-in-
all" argument, the objectors sought to strike 324 [6] signatures
based on individual signature challenges. *Id.* at 65.

The candidate moved to strike all allegations of fraud in the
objectors' petition as "immaterial and impertinent." *Id.* at 25.
According to the candidate, signature pages were withdrawn
after review by his attorneys, who concluded that for those
pages, the circulators did not "review or personally oversee"
signatures. The candidate stated that his attorneys applied a

> affiant's knowledge and belief, the signers are qualified electors and
> duly registered and enrolled members of the designated party of the
> State, or of the political district, as the case may be.

6. This number included thirty-one signatures on one of the pages
withdrawn by the candidate. Therefore, the actual number of disputed
individual signatures was 293. N.T., 3/7/08, at 66.

strict interpretation of this Court's decision in *In re Nomination Petition of Flaherty,* 564 Pa. 671, 770 A.2d 327 (2001), to withdraw the pages solely for the purpose of the proceeding and did not thereby acknowledge any "fraud." According to the candidate, under *Flaherty,* signatures that were affixed without review or oversight by the circulator-affiant were technically invalid. But, the candidate argued, *Flaherty* clearly instructed that whole pages could not be excised simply because they contained some invalid signatures; instead, any valid signatures had to be counted. N.T., 3/7/08, at 27–28. Further, the candidate reiterated the relevancy and the prior bad acts arguments from his motions *in limine* in favor of excluding references to notary Jonathan J. Oriole and any withdrawn signature pages, and prohibiting the objectors from calling individual circulators as witnesses in pursuit of the objectors' "false-in-one, false-in-all" theory.

Judge Friedman granted the candidate's motions *in limine.* The objectors asked for clarification of the decision, renewing their argument that, if a circulator was called and admitted that s/he did not know the requirements then, regardless of whether a page contained otherwise valid signatures, the entire signature page had to be stricken. *Id.* at 38–61. The court ultimately permitted the objectors to call individual circulators but only to question them about individual signatures (*i.e.,* did you circulate this signature page, did you get this signature, and did you get this page notarized). The court denied the objectors' request to question the circulators' knowledge of the legal requirements of an affidavit, Section 909, or their knowledge that some affidavits were false. N.T., 3/7/08, at 72–73.

Next, the court asked whether, in light of its ruling, the objectors had sufficient challenges to individual signatures to show that the candidate did not secure the required 500 signatures to appear on the April 2008 primary ballot. The objectors responded that they were contesting an additional 293 signatures, but conceded that over half of those challenges were unlikely to be successful and indicated that they would not prevail in striking the nomination petition on this ground.

N.T., 3/7/08, at 66. Thus, the objectors chose not to proceed on the individual challenges. *Id.* at 74–75. The candidate noted for the record that he would have established the validity of 629 signatures. *Id.* at 80. The court accepted the objectors' concession and dismissed their petition. The court also denied the candidate's motion to strike certain challenges for insufficient specificity. On March 10, 2008, the court issued an order denying the objectors' petition, directing the Secretary of the Commonwealth to place the candidate on the April 2008 Democratic Party primary ballot, and ordering the objectors to pay the costs of litigation.

On March 14, 2008, Judge Friedman issued a published opinion in support of the March 10 order. *See In re Nomination Petition of Farnese,* 945 A.2d 274 (Pa.Cmwlth.2008) (*Farnese I* ). The court rejected the objectors' "false-in-one, false-in-all" argument and held that because each individual signature page had its own circulator affidavit, it was "improper to strike any particular sheet based on the invalidity of the [c]irculator [a]ffidavit on another sheet." *Id.* at 278. The court found support for this decision in the Election Code, which provides that the invalidity of any page of a nomination petition does not affect the validity of the entire petition and requires that each signature page have a separate circulator's affidavit. *See id.* (citing 25 P.S. §§ 2936, 2869). The court also relied on the panel decision in *In re Pittsburgh Home Rule Charter,* 694 A.2d 1128 (Pa.Cmwlth.1997), which had rejected an argument from challengers that a nomination petition had to be stricken because the number of invalid signatures on the petition—twenty percent—"raised serious questions about the integrity" of the circulators' affidavits. The *Pittsburgh Home Rule Charter* court refused to strike the entire petition because there was no proof that the remaining individual signatures—eighty percent of the total—were invalid.

Judge Friedman also explained her underlying evidentiary rulings relating to the withdrawn signature pages and the testimony of circulators, noting that "any evidence relating to the withdrawn pages would have been irrelevant to whether

the [c]irculator [a]ffidavits or signatures on the non-withdrawn pages were valid." 945 A.2d at 278. In addition, the court concluded that the withdrawn pages could not be used to impeach the credibility of witnesses who circulated both withdrawn and non-withdrawn signature pages because "a party may not attack the character of a witness for truthfulness by cross-examination or extrinsic evidence concerning specific instances of the witness'[s] conduct." *Id.* (citing Pa.R.E. 608(b)(1)). Finally, the court reasoned that evidence of the circulators' "prior bad acts"—their alleged fraudulent and/or illegal conduct with respect to withdrawn pages—was not admissible to prove the circulators' character and that they had acted in conformity with those bad acts with regard to other signature pages. *Id.* (citing Pa.R.E. 404 cmt.). The court noted that "[t]o the extent [o]bjectors argue that the circulators of the withdrawn pages appear to have engaged in fraud, [the Commonwealth Court] has stated that allegations of a pattern of fraud are immaterial in a case involving objections to nomination papers and that such allegations will be disregarded." *Id.* at 278 n. 10 (citing *In re Nomination Paper of Rogers*, 908 A.2d 942, 947 (Pa.Cmwlth.2006) (single-judge opinion by Colins, P.J.)).

The objectors appealed and, on April 8, 2008, this Court affirmed in part by *per curiam* order with an opinion to follow. *See In re Nomination Petition of Farnese*, 605 Pa. 375, 989 A.2d 1274 (2008).[7] Specifically, we affirmed the order only to the extent it denied the petition to set aside the candidate's nomination petition. The order noted, however, that it was entered without prejudice to objectors subsequently seeking review of any future final order imposing costs, and directed the lower court to categorize and state its rationale if it chose to impose such costs.

Thereafter, on April 19, 2008, the candidate filed a bill of costs with the Commonwealth Court and requested an award of $11,426.22, itemized as follows:

7. An Opinion in Support of *Per Curiam* Order and three Concurring Opinions are being filed in the companion matter contemporaneously with this Majority Opinion.

**Thorp, Reed & Armstrong, LLP**[8]

| | |
|---|---:|
| Telecopy | $ 69.70 |
| Telephone | 18.90 |
| Copies | 2,363.60 |
| Business Development/Meals | 20.89 |
| Business Development/Travel | 250.71 |
| Travel Expense | 156.63 |
| Dining Expense | 22.47 |
| Airfare | 1,135.00 |
| Lodging | 938.87 |
| Taxis, Subways & Buses | 214.50 |

**Outside Vendors**

| | |
|---|---:|
| Depositions/Transcripts: Veritext Pa. Reporting Co. | 317.95 |
| Affidavits/Notary Fees: Tara Wallace | 725.00 |
| Process Service: B & R Servs. for Professionals, Inc. | 118.00 |
| Subpoenas: Commonwealth Court | 40.00 |
| Handwriting Analysis/Written Report/Trial preparation: Michelle Dresbold | 4,909.00 |
| Outside Copies | 125.00 |

**Total Costs:** **$11,426.22**

Candidate's Bill of Costs, 4/19/08, at 2–3. The candidate also attached several supporting invoices. The request for costs, although made pursuant to Section 977 of the Election Code, did not include any legal argument regarding whether awarding costs here was "just." *See* 25 P.S. § 2937 (court to order costs "as it shall deem just").

The objectors filed exceptions to the bill of costs claiming that because they had not engaged in any "fraud or misconduct," no costs should be awarded to the candidate. The objectors added that, although they were ultimately unsuccessful in striking the nomination petition, their challenge was forwarded in good faith, "showed serious and extensive problems" with the nomination petition, and resulted in the withdrawal of over half of the signatures initially filed with the Commonwealth's Secretary of State. According to the objectors, imposing costs would constitute an abuse of discretion because they acted "appropriately," without delay or animosity between the parties. The objectors further claimed that imposition of costs here, where misconduct was absent, would

---

**8.** This Pittsburgh-based law firm represented the candidate at hearings in Philadelphia.

have a chilling effect on political speech. Objectors' Answer to Bill of Costs, 4/29/08, at 2–5 (citing *In re Nomination Paper of Nader*, 588 Pa. 450, 905 A.2d 450 (2006) (*Nader III* )[9]; *Rogers, supra* ). In the alternative, the objectors challenged the individual categories of costs, with the exception of the transcript cost, on the ground that they were excessive and associated with the candidate's decision to hire a Pittsburgh-based firm to litigate in Philadelphia. Further, they claimed that reimbursement of Ms. Dresbold's expert fees should not have been awarded because the candidate did not present any expert testimony in court. *Id.* at 6.

On May 5, 2008, Judge Friedman awarded the candidate $5,250.95 in costs, which represented payment in full for the hearing transcript, for twelve subpoenas, and for the handwriting expert services of Ms. Dresbold. *In re Nomination Petition of Farnese*, 948 A.2d 215, 221 (Pa.Cmwlth.2008) (*Farnese II* ). The court concluded that pursuant to Section 977 and *Nader III, supra,* it had discretion to impose these costs.

According to the lower court, levying costs against the objectors, the losing party here, was proper except where such an award would be "unjust." The lower court noted that although this Court had not provided specific guidance regarding the circumstances in which an award of costs is appropriate under Section 977, "the legislature [had] set forth some standards for the imposition of costs" via Section 1726 of the Judicial Code. *Farnese II*, 948 A.2d at 217 (citing 42 Pa.C.S. § 1726(a)). Section 1726(a) states in relevant part:

The governing authority[10] shall prescribe by general rule[11]

9. In *Nader III*, this Court affirmed the Commonwealth Court's decision to award costs of litigation to the challengers of the nomination petitions of Ralph Nader and Peter Miguel Camejo for President and Vice–President of the United States, respectively. *In re Nomination Papers of Nader*, 580 Pa. 22, 858 A.2d 1167, 1171–73 (2004) (*Nader I* ), and *In re Nomination Paper of Nader*, 580 Pa. 134, 860 A.2d 1 (2004) (*Nader II* ) addressed the merits of the challenge to the nomination petitions.

10. "Governing authority" is defined as the Pennsylvania Supreme Court or any agency/unit of the Unified Judicial System to which the Supreme Court has delegated its power. 42 Pa.C.S. §§ 102, 1721.

11. "General rule" is defined as "[a] rule or order promulgated by the governing authority." 42 Pa.C.S. § 102. A rule is "promulgated by a

the standards governing the imposition and taxation of costs, including the items which constitute taxable costs, the litigants who shall bear such costs, and the discretion vested in the courts to modify the amount and responsibility for costs in specific matters. All system and related personnel shall be bound by such general rules. In prescribing such general rules, the governing authority shall be guided by the following considerations, among others:

(1) Attorney's fees are not an item of taxable costs except to the extent authorized by section 2503 (relating to right of participants to receive counsel fees).

(2) The prevailing party should recover his costs from the unsuccessful litigant except where the:

\* \* \*

(iii) Application of the rule would work substantial injustice.

The court then analyzed the individual categories of expenses cited by the candidate. First, the court deemed the following expenses to be attorneys' fees and held that, under Section 1726 of the Judicial Code, attorneys' fees were not "taxable costs" to be awarded to the candidate: Business Development/Meals, Business Development/Travel, Travel Expense, Dining Expense, Airfare, Lodging, Taxis, Subways & Buses. Second, the remaining expenses billed by the candidate's law firm and the request for costs of "outside copies" were rejected because of insufficient supporting documentation. The court concluded that it would be "unjust" to bill those amounts to the objectors in view of the deficiencies. Third, the court denied as "unjust" all costs relating to notary expenses for sixty-five affidavits which, the court concluded, would have had no evidentiary value. Fourth, the court denied the request for service of process costs associated with serving subpoenas on the objectors because the candidate had not included the objectors on his witness list so they would not have been permitted to testify. *Id.* at 218–21.

court" and "regulates practice or procedure before the promulgating court." *Id.* An order "[i]ncludes judgment, decision, decree, sentence and adjudication." *Id.*

Turning to the costs it did assess against the objectors, the court posited that, under *Nader III, supra,* and *Rodgers, supra,* the candidate was the "prevailing party" and therefore was permitted to recover $317.95 for transcription costs, which included the stenographer's "appearance fee and the cost for the transcription of the notes of testimony." *Id.* at 220. In addition, the court ordered the objectors to pay $24.00, the expense of issuing subpoenas for all twelve persons on the candidate's witness list.[12] Last, the court awarded the candidate $4,909.00 "for handwriting analysis by Michelle Dresbold, the handwriting expert's written report and trial preparation." The objectors had argued against levying costs for an expert because Ms. Dresbold did not testify. According to the court, however, the only reason that Ms. Dresbold did not testify was because the objectors chose not to proceed with their individual signature challenges, and the candidate obviously "needed to be prepared" for that eventuality. *Id.* at 221.

On May 7, 2008, the objectors appealed the award of costs to this Court.[13] This Court noted probable jurisdiction, ordered the parties to file briefs, and then scheduled oral argument. The objectors raised two issues on appeal, one concerning the propriety of awarding costs at all in this instance, and one concerning the award of costs for a handwriting expert who did not ultimately testify.

 In reviewing an award of costs, the lower court's conclusions of law are subject to plenary review under a *de novo* standard but, where the lower court's authority to award costs is clear, we are limited to determining only whether the court "palpably abused its discretion" in levying costs. *See Nader III,* 905 A.2d at 456; *Lucchino v. Commonwealth,* 570 Pa. 277, 809 A.2d 264, 268–69 (2002). "An abuse of discretion is not merely an error of judgment, but if in reaching a

12. The court concluded that it would be "unjust" for the objectors to pay for subpoenas to the eight witnesses who would have been precluded from testifying because they were not on the list filed by the candidate with the court.

13. The candidate did not appeal the award insofar as it denied him requested items of reimbursement.

conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused." *Oeler v. Oeler,* 527 Pa. 532, 594 A.2d 649, 651 (1991). The record must support the lower court's findings of fact with regard to the conduct of the litigant that justified the award of costs. *See Thunberg v. Strause,* 545 Pa. 607, 682 A.2d 295, 299, 302 (1996).

Initially, the objectors claim that the lower court abused its discretion by awarding the candidate costs of litigation without finding that the objectors had acted in bad faith or engaged in intentional misconduct.[14] In their view, the lower court's decision stands for the proposition that in an election challenge, costs will be automatically awarded to the prevailing party—candidate or challenger. The objectors argue that the court's application of the cost-allocation provision has a serious chilling effect on both candidates and voter-challengers. The objectors emphasize the narrow timeframe of election litigation[15] and the expediency with which the parties must obtain "handwriting experts, computer review, statistical review, subpoenas, transcripts, investigation," which come at a high cost that already is not affordable for many potential candidates and challengers. To properly balance the interests of protecting the integrity of the election process and ensuring ballot access, the objectors argue that this Court should hold that the court below was required to find that the objectors had

14. The objectors also argue briefly that Section 977 allows a court to assess costs only against the candidate, in the event his nomination petition is set aside. Objectors posit that a challenger whose petition to set aside is dismissed is not subject to the Election Code's cost-allocation provision. This issue, however, was raised for the first time on appeal and is therefore waived. *See* Pa.R.A.P. 302(a).

15. A nomination petition must be circulated after the thirteenth Tuesday (three months and one week) before the primary. *See* 25 P.S. § 2868. The candidate must then obtain the necessary valid signatures and file the nomination petition prior to the tenth Tuesday before the primary ("filing deadline"), *i.e.,* within three weeks of initiating circulation. *Id.* Afterwards, challengers have but one week from the filing deadline to object to the nomination petition. *See* 25 P.S. § 2937. A hearing in court on the objections must be scheduled within ten days, and the case decided within fifteen days after the filing deadline. *Id.*

engaged in some type of bad conduct, rather than simply that they lost their election challenge, before ordering the losing party to pay the prevailing party's costs. The objectors suggest that this Court should adopt a "gross misconduct or fraud" threshold to awarding costs in election challenges.

Second, the objectors argue that ballot access and candidate eligibility are protected by the U.S. Constitution and claim that the decision below violated their associational and equal protection rights under the First and Fourteenth Amendments. The objectors rely on cases in which federal courts have struck down: a poll tax; several mandatory filing fees for placement on the ballot; a requirement that a party conduct and fund primary elections as a condition of ballot access; and a requirement that minor political party candidates pay a fee to cover the state's cost of verifying signatures on nomination petitions. Objectors' Brief, 7/15/08, at 32–37 (citing *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (poll tax unconstitutional); *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (filing fee unconstitutional); *Belitskus v. Pizzingrilli*, 343 F.3d 632 (3d Cir.2003) (filing fee unconstitutional); *Republican Party of Arkansas v. Faulkner County*, 49 F.3d 1289 (8th Cir.1995) (requirement to conduct and fund primary unconstitutional); *Fulani v. Krivanek*, 973 F.2d 1539 (11th Cir.1992) (fee for signature verification unconstitutional)). According to the objectors, in Pennsylvania, allocating the high costs of election litigation to an unsuccessful party has the same "chilling impact" as the fees that were struck down in the federal cases. The objectors stress that automatic cost awards to a prevailing party burden both candidates and challengers equally. In the objectors' view, levying costs should be the exception, available only in cases of "pervasive fraud and misconduct," rather than the new rule. *Id.* at 39–40 (citing *Nader III, supra* ).

As a final and more limited alternative, the objectors argue that the lower court should have denied the candidate's request for expert costs as excessive and unwarranted. The objectors emphasize that Ms. Dresbold, the candidate's hand-

writing expert, did not testify, yet billed thirty-three hours at
$125.00 per hour for "review of signatures and petitions,
expert opinion, report, travel[,] and meetings." Objectors'
Brief, 7/15/08, at 40. According to the objectors, expert costs
should have been denied as insufficiently specific because Ms.
Dresbold did not itemize her bill and was not available for
cross-examination regarding the charges. Further, the objec-
tors contend that expert costs in election matters should not
be assessed in general, and especially where the expert does
not testify, because they chill political speech. Finally, the
objectors argue that, at a minimum, the expert's travel time
should not be included in the costs levied.

The candidate does not dispute that there is no evidence of
fraud, misconduct, or bad faith on the part of the objectors
here. The candidate argues, however, that costs of litigation
may be assessed at the court's discretion. He contends that,
in reviewing that exercise of discretion, this Court may not
make "a case by case assessment" of what the lower court
found to be just but must affirm "absent a palpable abuse of
discretion." Candidate's Brief, 8/18/08, at 5 (citing *Nader III,
supra*). According to the candidate, the lower court had
"ample basis" for levying costs and cites the necessity of
retaining a handwriting expert, collecting affidavits from wit-
nesses, and expending considerable resources in order to
remain on the ballot. In contrast, the candidate notes that the
objectors did not present any expert or witness testimony and
ultimately conceded that their line-by-line signature challenges
lacked merit.

The candidate also dismisses the objectors' constitutional
claims as meritless. In his view, the objectors' "constitutional
challenge cannot succeed because the cost provision of Section
977 does not impinge upon any constitutional rights in a way
that would warrant constitutional scrutiny." *Id.* at 6 (quoting
*Nader III, supra*).

Finally, the candidate claims that the lower court acted
within its discretion to award expert costs even though Ms.
Dresbold did not testify. According to the candidate, the
court correctly ruled that Ms. Dresbold's services were re-

quired and the only reason she did not testify was because the objectors conceded that they could not prevail on the individual signature challenges they had forwarded. The candidate claims that he was entitled to the full amount of costs in this regard, which included thirty-three hours (at $125 per hour) to review signature cards and petitions, to prepare an expert report, to travel and to attend meetings, three hours (at $250 per hour) for "court time," and $34 for parking. The candidate thus asks this Court to affirm the award of costs in its entirety.

The objectors' preserved statutory arguments pose one basic issue of statutory interpretation: whether, under Section 977 of the Election Code, the court has discretion to award costs to the challenged candidate on the apparent single ground that he prevailed in the underlying litigation. Section 977 states in relevant part:

All nomination petitions and papers received and filed within the periods limited by this act shall be deemed to be valid, unless, within seven days after the last day for filing said nomination petition or paper, a petition is presented to the court specifically setting forth the objections thereto, and praying that the said petition or paper be set aside.... **In case any such petition is dismissed, the court shall make such order as to the payment of the costs of the proceedings, including witness fees, as it shall deem just.**

25 P.S. § 2937 (emphasis added). According to the objectors, the court below abused its discretion in assessing costs against them without a finding of bad faith, intentional misconduct, gross misconduct, or fraud.

■ For the reasons that follow, we agree with the objectors and hold that, under Section 977, an award of costs to the prevailing party is not warranted solely on the basis that the party prevailed in the underlying nomination petition challenge. We also necessarily conclude that the lower court abused its discretion in assessing costs against the objectors without identifying any reason specific to this case or, indeed, in these types of cases, why justice would demand shifting costs to them.

564 

 Preliminarily, we must question the trial court's reliance upon Section 1726(a) of the Judicial Code as setting forth "some standards for the imposition of costs." Section 1726(a) does not purport to set forth governing substantive standards, but instead is directed at this Court (or an entity within the Unified Judicial System to which we delegate the authority), as the defined "governing authority," when prescribing "general rules" on the subject of assessing costs. *See, e.g.,* Pa.R.A.P. 2744 & note (rule promulgated pursuant to 42 Pa.C.S. § 1726 permits appellate court to award costs "as may be just" to appellee in frivolous appeal). Laying aside any separation of powers issue that Section 1726 may present, the list of considerations enumerated in Section 1726(a) does not create any substantive right in a prevailing party to recover costs in Pennsylvania.

 Indeed, the candidate here sought costs, not under Section 1726 or a rule/order of this Court, but under a specific statutory provision—Section 977 of the Election Code.[16] Generally, Pennsylvania adheres to the "American Rule," which states that litigants are responsible for their own litigation costs and may not recover them from an adverse party "unless there is express statutory authorization, a clear agreement of the parties, or some other established exception." *Trizechahn Gateway LLC v. Titus,* 601 Pa. 637, 976 A.2d 474, 482–83 (2009); *see Commonwealth, Dep't of Envtl. Prot. v. Bethenergy Mines, Inc.,* 563 Pa. 170, 758 A.2d 1168, 1173 (2000). Section 977 of the Election Code authorizes a court to award costs of the proceedings (including witness fees) to the prevailing party (the party securing dismissal of a petition) in an election matter, not automatically, but "as it shall deem just." 25 P.S. § 2937. We read the provision to be consonant with the general policy of the American Rule that shifting of costs is exceptional.

16. To date, this Court has not adopted any global rule of civil procedure regarding costs relevant to the matter before us. The court below also took judicial notice that this Court has not promulgated general rules for imposing costs in election matters. *Farnese II,* 948 A.2d at 217 n. 3.

■ Section 977 conditions the assessment of costs on whether the award would be "just," with no further direction, leaving the decision of what "just" means in the context of specific cases to the discretion of the judicial officer. We have no doubt that the General Assembly contemplated that the courts would bottom decisions to assess costs upon the facts and policy concerns surrounding each individual election matter, rather than simply awarding costs to the prevailing party. *Cf. Bowser v. Blom*, 569 Pa. 609, 807 A.2d 830, 836–37 (2002) (where court "may" award costs and legal fees, prevailing party is not entitled to automatic award but must "establish" entitlement to costs under totality of circumstances). Indeed, if the General Assembly intended a prevailing party rule here, it would have been simple enough to formulate such a rule.[17] Use of the word "just" contemplates a more nuanced, calibrated decision, perhaps difficult, but not at all a strange matter for courts of justice. *See, e.g., PECO Energy Co. v. Pa. Pub. Util. Comm'n*, 568 Pa. 39, 791 A.2d 1155, 1163 (2002) (court guided only by "fundamental requirement that its decision be just and reasonable" in dividing costs of relocating public utility between Commonwealth and utility);[18] Pa.R.A.P. 2744 ("appellate court may award as further costs damages as may be just" if it determines that appeal is frivolous).

■ In this case, the trial court cited to no reason specific to this case, where the losing party prevailed in significant

17. Notably, in other areas, the General Assembly has devised cost-allocation provisions that specifically mandate the award of enumerated costs to prevailing litigants. *See, e.g.,* 77 P.S. § 996 (under Workers' Compensation Act, "the employe[e] … in whose favor the matter at issue has been finally determined in whole or in part shall be awarded, in addition to the award for compensation, a reasonable sum for costs incurred"). Where courts have discretion, cost-allocation provisions have been applied "to justly compensate parties who have been obliged to incur necessary expenses in prosecuting lawful claims or in defending against unjust or unlawful ones." *Lucchino*, 809 A.2d at 269 (citing Clean Streams Law provision, 52 P.S. § 1396.4(b), which states that hearing board "may in its discretion order the payment of costs and attorney's fees it determines to have been reasonably incurred by such a party in proceedings pursuant to th[e] section").

18. In *PECO*, the Court noted that costs may be assessed at anywhere between 0 and 100 percent of the amount requested. *See PECO*, 791 A.2d at 1163.

material respects of its challenge, why justice would demand shifting costs to the losing party. Instead, it appears the court essentially adopted a presumption in favor of cost-shifting that is in tension with both the plain language of Section 977 and the American Rule. The award is not supportable on its terms.

The objective factors here reveal no circumstances that would necessarily or obviously require an award of costs. Neither the trial court nor the candidate have cited anything in the conduct of the objectors, both in initiating and then pursuing their challenge, to indicate bad faith, harassment, or misconduct. This stands in contrast to the situation in *Nader III*. There, this Court affirmed an award of costs in favor of the objectors, holding that the Commonwealth Court did not abuse its discretion in assessing costs where the candidates' conduct, "through their representatives (not their attorneys) shock[ed] the conscience of the [c]ourt." 905 A.2d at 459. The record in *Nader III* showed extensive "fraud and deception implicated in [the candidates'] signature-gathering efforts." *Id.* In this case, the most that can be said is that the objectors ultimately withdrew their individual signature challenges; but, significantly, they did so only after the trial court rejected the "false-in-one, false-in-all" theory that was necessary to the success of those challenges.[19]

Given the extreme circumstances presented in *Nader III*, the objectors here predictably propose adoption of a simple, blackletter rule that parties must prove fraud, bad faith, intention, or gross misconduct to recover costs of litigation in election matters. We decline the invitation. The plain language of Section 977 does not establish such a high threshold. 25 P.S. § 2937; *see Rogers*, 942 A.2d at 923 (no support for candidate's position that "costs can only be imposed if the court finds fraud and deception in mass proportions"); *accord Nader*, 905 A.2d at 459 (court's exercise of discretion justified

19. Indeed, the fact that the objectors immediately withdrew their line-by-line challenges after recognizing that the court's ruling on their "false-in-one, false-in-all" claim made their petition untenable suggests responsible, not vexatious, conduct.

under factual circumstances). Further, if the General Assembly intended such a rule, it could have easily conveyed that intention expressly. *See, e.g.,* 25 P.S. § 3469 (providing that: "if the committee or court or judge shall decide that the complaint is without probable cause, the petitioners, and every one of them, shall be jointly and severally liable for all the costs, and the same may be collected as debts of like amount are by law collectible."). Instead, to reiterate, the General Assembly spoke in terms of what is just, which we believe requires the court to assess the particular facts, the nature of the litigation, and other considerations as may appear relevant.

We have no difficulty with the notion that, where fraud, bad faith, or gross misconduct is proven, justice may require an award of costs. But, it is equally self-evident that a party's conduct need not proceed to such an extreme before an award of costs may be dictated by justice. For example, there are positions taken in litigation which, though they may fall short of the legal standard of frivolous, nevertheless have so remote a chance of success, or are so clearly foreclosed by existing authority, that an award of costs may be justified.[20] Not all parties who forward plainly meritless claims do so with bad intentions; it may be a lapse of judgment, or a failure to fully understand an arcane area of law in the short time available for challenges, etc. We thus reject the heightened rule posed by the objectors, just as we reject the prevailing party's position here.

20. "[A] complaint, containing as it does both factual allegations and legal conclusions, is frivolous where it lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (complaint that fails to state claim is not automatically frivolous as matter of law). The term frivolous "embraces not only the inarguable legal conclusion, but also the fanciful factual allegation." *Id.* We recognize that the objectors raised their central and necessary claim—the "false-in-one, false-in-all" argument—to a court that was bound by precedent to reject it. *See Farnese I,* 945 A.2d at 278 (citing *In re Pittsburgh Home Rule Charter, supra* ). Notably, however, neither the trial court nor the candidate has suggested that shifting costs was "just," under Section 977, on this basis.

568

The conduct of the parties and the relative strength of their legal positions are not the only factors relevant to the discretionary assessment of whether to shift costs to the losing party in an election contest. First, we note that the Election Code must "be liberally construed to protect a candidate's right to run for office and the voters' right to elect the candidate of their choice." *In re Nomination Petition of Driscoll,* 577 Pa. 501, 847 A.2d 44, 49 (2004); *In re Nomination Petition of Flaherty,* 564 Pa. 671, 770 A.2d 327, 331 (2001); *see also Lubin v. Panish,* 415 U.S. 709, 715–16, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974). On the other hand, the policy of reading the Election Code liberally "cannot be distorted to emasculate those requirements necessary to assure the probity of the [election] process." *Driscoll,* 847 A.2d at 50. Indeed, the existence of specific filing requirements envisions that there will be challenges.

Further, requirements as to form and contents of nomination petitions are "not mere technicalities but are necessary measures to prevent fraud and to preserve the integrity of the election process." *In re Nomination Petition of Cianfrani,* 467 Pa. 491, 359 A.2d 383, 384 (1976); *In re Nomination Papers of Nader,* 580 Pa. 22, 858 A.2d 1167, 1171–73 (2004) (*Nader I* ). The ability of a party to object to nomination papers when requirements are not met "provides an important check on the nomination process." *In re Nomination Petition of James,* 596 Pa. 442, 944 A.2d 69, 72 (2008). Thus, at the same time that candidates for office should not be exposed to the time and expense of defending baseless challenges, candidates must be cognizant of their own obligations. In short, both candidates and objectors play important roles in our electoral process.

Second, in assessing what is just, the court must be cognizant of the practical reality that both parties in election contests are operating within the truncated timeframes of the Election Code. As a result, candidates generally err on the side of filing well in excess of the required signatures, perhaps with near certainty that a number of them will be invalid, and

in the hope of deterring any challenge. *See, e.g., Nader I,* 858 A.2d at 1171–73 (candidate filed over 52,000 signatures where approximately 25,000 were required for nomination); *In re Nomination Petition of Morrison–Wesley,* 946 A.2d 789 (Pa. Cmwlth.2008) (candidate filed approximately 2,000 signatures where 1,000 were required); *In re Petition to Set Aside Nomination of Fitzpatrick,* 822 A.2d 867 (Pa.Cmwlth.2003) (candidate filed approximately 1,500 signatures where 750 were required). On the other hand, depending on the number of signatures involved and required, prospective objectors often have a limited opportunity for extensive investigation of signatures prior to expiration of the period for forwarding objections. Thus, objectors often must determine whether to proceed at a point where the prospect of success is uncertain.

With these considerations in mind, we hold that the award of costs in this case must be reversed because neither the court below nor the candidate has identified any circumstance, other than the simple fact that the candidate prevailed, to support a finding that an award of costs would be just here.[21]

Pursuant to long-standing precedent of this Court, we will not reach the constitutional arguments presented by the objectors, having been able to decide this case on statutory grounds. *See P.J.S. v. Pa. State Ethics Comm'n,* 555 Pa. 149,

---

21. Mr. Justice Eakin suggests in his Concurring and Dissenting Opinion that a remand is appropriate here so that the court below can articulate additional reasons it may have to deem "just" the award of costs to the candidate. According to the opinion, the shortcoming here—the absence of an adequate basis to award costs—is the court's and not the candidate's. But, the candidate was the moving party requesting litigation costs and has already had two opportunities to identify the basis for that request. *See Bowser,* 807 A.2d at 837 (applicant failed to establish entitlement to counsel fees pursuant to 23 Pa.C.S. § 4351(a); Section 4351(a) states that court "may" assess costs and counsel fees in favor of prevailing party in child support case); *cf. Jones v. Muir,* 511 Pa. 535, 515 A.2d 855, 859 (1986) (applicant for counsel fees from common fund has burden of proving his/her entitlement to those fees). As discussed, *supra,* the candidate requested costs on the ground that he was a prevailing party and on the ground that the objectors withdrew their line-by-line challenges. We have deemed both grounds insufficient to justify awarding costs. We see no basis to remand; and we note that the candidate has not requested such an alternative disposition.

723 A.2d 174, 176 (1999) ("court should not reach the constitutional issue if the case can properly be decided on non-constitutional grounds"); *In re Fiori*, 543 Pa. 592, 673 A.2d 905, 909 (1996) (same). We also need not address the objectors' alternative claims regarding the court's alleged abuse of discretion in assessing against them the cost of Ms. Dresbold's services.

For the above-stated reasons, we hold that the lower court abused its discretion in awarding the prevailing candidate costs of litigation in the amount of $5,250.95. The Order awarding costs is reversed.

Jurisdiction relinquished.

Justice GREENSPAN did not participate in the decision of this matter.

Justices BAER and TODD join the opinion.

Justice SAYLOR files a concurring opinion.

Justice McCAFFERY files a concurring opinion.

Justice EAKIN files a concurring and dissenting opinion.

Justice SAYLOR concurring.

I join the majority opinion, subject to the observation that I have been in a minority position in a number of the background decisions. Thus, I remain circumspect about: reading Section 977 of the Election Code as sanctioning discretionary cost awards against candidates, *see In re Nader*, 588 Pa. 450, 468–70, 905 A.2d 450, 461–62 (2006) (Saylor, J., dissenting);[1] the character, scope, and legal significance of the signature irregularities noted in the *Nader* matter, *see In re Nader*, 580 Pa. 134, 135–48 & n. 13, 860 A.2d 1, 1–10 & n. 13 (2004) (Saylor, J., dissenting); and the import of potential inferences which may be drawn from truly wide scale signature impro-

---

1. Although this is not a case in which costs were assessed against a candidate, the mutuality reflected in the prevailing interpretation of Section 977 makes it necessary to consider the impact on the elective franchise in determining the appropriate judicial approach to costs awards.

prieties in situations where these may be tied to the candidate himself. *See In re Payton,* 596 Pa. 469, 470–72, 945 A.2d 162, 163–64 (2008) (Saylor, J., concurring).

Justice McCAFFERY, concurring.

I join the majority in determining that the award of costs must be reversed. I write separately to observe and emphasize that the objective factors here, including that the candidate conceded that 1077 of the 1778 signatures contained in his nomination petition were invalid, would support an inference that the appellant objectors acted in good faith in initiating and pursuing their challenge to the authenticity of the signatures contained in the petition. On this relevant fact alone, I believe, the court's award of costs to the candidate should be considered an abuse of discretion. Under the circumstances, the candidate should have expected that litigation would likely ensue, and I can see no just reason to support a judicial shifting of costs to the objectors where the candidate admitted that more than 60% of the signatures contained in his petition were invalid.

Moreover, this Court has stated that the statute permitting an assessment of costs where a court deems it just "is consistent with the interest of the Commonwealth in ensuring fair elections that are free from the taint of fraud." *In re Nomination Paper of Nader,* 588 Pa. 450, 905 A.2d 450, 460 (2006). In our disposition of the appeal from the trial court's denial of the objectors' petition to set aside the nomination petition in this case, we expressed our concern that a candidate for office "should not be permitted to submit a nomination petition that contains mostly illegitimate signatures without doubt being cast upon the propriety of the candidate's signature procurement process." *In re Nomination Petition of Farnese,* 17 A.3d. 375, 377 (Pa.2011). The circumstances here cast doubt upon the candidate's method of procuring signatures and support a colorable allegation of fraudulent conduct. Accordingly, I believe the allocation of costs to the party that sought to shed greater light on the seemingly

tainted conduct represents a manifestly unreasonable judgment, and an abuse of discretion.

Justice EAKIN, concurring and dissenting.

I agree with the majority's conclusion that the mere fact candidate prevailed against the challenge to his nomination petition is insufficient to support an award of costs to him. It will not suffice to submit an invoice with neither explanation of why the award of costs would be "just," nor reference to 25 P.S. § 2937; likewise, an award without reference to § 2937's requirement that the award be "just" is insufficient for review purposes.

I disagree, however, that the proper remedy is simply reversal of the order awarding costs. The applicable standard is whether the lower court abused its discretion, *see* Majority Op., at 563, 17 A.3d at 369, and where, as here, the record is silent concerning the lower court's analysis, we cannot determine whether such discretion was properly exercised. Candidate should not be thrown completely out of court simply because the trial court was quick to grant relief but failed to provide its analysis. As long as the record provides some reason to suggest § 2937's standard for an award of fees may be met, remand for further elucidation is the better course. *See Borough of Beaver v. Steckman*, 728 A.2d 418, 420–21 (Pa.Cmwlth.1999) (distinguishing reversal of award of attorney's fees without remand in *Township of South Strabane v. Piecknick*, 546 Pa. 551, 686 A.2d 1297 (1996), on grounds there was no indication of contemnor's bad faith on record in *Piecknick*, whereas record in *Steckman* indicated contemnor acted in bad faith). Similarly, while the trial court here provided no analysis of the applicable standard, the record does not indicate the standard cannot be met, so the award of costs may still be appropriate. Candidate's entitlement to costs cannot be ignored because the trial court originally acted too quickly and without articulation—the shortcoming seems the court's, not the litigant's, and the litigant's request should thus be given proper consideration. Accordingly, I would

remand for the trial court to articulate such reasons it may have to deem the award just.

Accordingly, I concur in the finding there was insufficient assessment of whether the award was just, but dissent as to the complete reversal of the award.