**[J-36-2023]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| IN RE: NOMINATION PETITION OF MICHAEL DOYLE AS CANDIDATE FOR REPRESENTATIVE IN CONGRESS FOR THE TWELFTH CONGRESSIONAL DISTRICT | : : : : : : | No. 78 MAP 2022<br><br>Appeal from the Order of the Commonwealth Court at No. 119 MD 2022 dated June 23, 2022. |
| OBJECTION OF: ERIC SLOSS AND SANDOR ZELEKOVITZ | : : : | SUBMITTED: April 19, 2023 |
| APPEAL OF: ERIC SLOSS AND SANDOR ZELEKOVITZ | : : : | |

## <u>OPINION</u>

**CHIEF JUSTICE TODD**                    **DECIDED:** November 22, 2023

In this direct appeal we are asked to determine whether the Commonwealth Court abused its discretion in ordering Appellants, Eric Sloss and Sandor Zelekovitz, ("Objectors") to pay the counsel fees of Appellee, Michael Doyle, a candidate for the Republican nomination for Representative of Pennsylvania's 12th Congressional District ("Candidate") in the May 17, 2022 Primary Election. These fees were incurred during the litigation of Objectors' petition to set aside Candidate's nominating petitions for lack of a sufficient number of legally valid signatures from Republican electors. After review, for the reasons we explain herein, we conclude that the Commonwealth Court abused its discretion in ordering Objectors to pay such fees. We therefore reverse its order in that respect.

## I. Factual Background and Procedural History

Given the issue before us, our review of the background and procedural history of this case, and in particular the hearings before the Commonwealth Court, is necessarily detailed.

Following the 2020 United States Census, the number of Representatives Pennsylvania was entitled under the United States Constitution to send to Congress was reduced from 18 to 17. This necessitated the implementation of a new congressional districting plan for our Commonwealth's remaining 17 congressional seats. Because the Governor and the General Assembly failed to agree upon such a suitable districting plan, the task fell to our Court to select a plan from among 13 proposed districting plans submitted for our Court's consideration, using the requirements for such districts mandated by the Constitution and federal law. Ultimately, our Court issued an order on February 23, 2022 selecting the present Congressional District Map, first used in the May 17, 2022 Primary Election. *Carter v. Chapman*, 273 A.3d 499 (Pa. 2022) (order).

In order to guarantee an orderly election process for that approaching primary, our order in *Carter* also modified the election calendar for that contest. In relevant part, the order specified that candidates for office were permitted to circulate nominating petitions from February 25, 2022 until March 15, 2022. *Id.* Our Court's order also set March 22, 2022 as the deadline for any objections to be filed to those nominating petitions, and it required the Commonwealth Court to schedule hearings on such objections to begin no later than March 25, 2022, as well as required that tribunal to render a decision on all objections by March 29, 2022. *Id.* The order further set April 2, 2022 as the last day for county boards of elections to send remote military-overseas absentee ballots. *Id.*

After the entry of our *Carter* order, Candidate began circulating nominating petitions as a candidate for the Republican Party nominee for Representative in the newly configured 12th Congressional District. He was required to obtain the "valid signatures"

of 1,000 "registered and enrolled members" of the Republican Party in order to accomplish this. 25 P.S. § 2872.1(12). On March 15, 2022, Candidate filed nominating petitions containing 1,351 signatures with the Secretary of the Commonwealth.

One week later, Objectors, who were registered Republican voters residing in the 12th Congressional District, filed in the Commonwealth Court a Petition to Set Aside Candidate's nominating petitions ("Petitions"), under 25 P.S. § 2937.[1] Objectors alleged

_____

[1] Section 2937 provides, in relevant part:

> All nomination petitions and papers received and filed within the periods limited by this act shall be deemed to be valid, unless, within seven days after the last day for filing said nomination petition or paper, a petition is presented to the court specifically setting forth the objections thereto, and praying that the said petition or paper be set aside. A copy of said petition shall, within said period, be served on the officer or board with whom said nomination petition or paper was filed. Upon the presentation of such a petition, the court shall make an order fixing a time for hearing which shall not be later than ten days after the last day for filing said nomination petition or paper, and specifying the time and manner of notice that shall be given to the candidate or candidates named in the nomination petition or paper sought to be set aside. On the day fixed for said hearing, the court shall proceed without delay to hear said objections, and shall give such hearing precedence over other business before it, and shall finally determine said matter not later than fifteen (15) days after the last day for filing said nomination petitions or papers. If the court shall find that said nomination petition or paper is defective under the provisions of [25 P.S. § 2936] or does not contain a sufficient number of genuine signatures of electors entitled to sign the same under the provisions of this act, or was not filed by persons entitled to file the same, it shall be set aside. If the objections relate to material errors or defects apparent on the face of the nomination petition or paper, the court, after hearing, may, in its discretion, permit amendments within such time and upon such terms as to payment of costs, as the said court may specify. In case any such petition is dismissed, the court shall make such order as to the payment of the costs of the proceedings, including witness fees, as it shall deem just. If a person shall sign any nomination petitions or papers for a greater number of candidates than he is

(continued…)

that, of the signatures Candidate submitted, only 634 were valid and that the remaining 717 signatures were "defective in at least one way—and often in multiple ways." Petition to Set Aside the Nomination Petitions of Michael Doyle, 3/22/22, at ¶ 11 (R.R. at 33a) (emphasis omitted).[2]

The next day, on March 23, 2022, the Commonwealth Court issued a "Scheduling and Case Management Order" which set a hearing on the Petition for April 4, 2022. (Scheduling and Case Management Order, 3/23/22, at 1 (R.R. at 251a)). The order provided that "Objectors shall immediately arrange to meet with Candidate or Candidate's representative and, if appropriate, with a SURE system operator,[3] to review before the hearing each and every challenged signature line." *Id.* at 3. The order additionally directed Objectors and Candidate to file, prior to the scheduled hearing, a stipulation identifying: the total number of completed signature lines submitted; the number of uncontested completed signature lines; the total number of signature lines which were

> permitted under the provisions of this act, if said signatures bear the same date, they shall, upon objections filed thereto, not be counted on any petition or paper and if they bear different dates, they shall be counted in the order of their priority of date, for only so many persons as there are candidates to be nominated or elected.

Act of June 3,1937, P.L. 1333, No. 320, art. IX, § 977, as amended, 25 P.S. 2937. The Commonwealth Court has "exclusive original jurisdiction of [c]ontested nominations." 42 Pa.C.S. § 764(1).

[2] R.R. denotes the Reproduced Record filed in this matter with our Court.

[3] SURE is an acronym for the "Statewide Uniform Registry of Electors." 25 Pa.C.S. § 1222. This registry is a "single, uniform integrated computer system" maintained by the Pennsylvania Department of State which is " a database of all registered electors in this Commonwealth." *Id.* § 1222(c)(1). The database contains individual information for each registered elector collected during the voter registration process, *i.e.*, the elector's name, address, party affiliation, the last four digits of their Social Security number, their driver's license or state ID number if they have such documentation, and their signature. *McLinko v. Department of State*, 279 A.3d 539, 575 (Pa. 2022). Registrars, employees, and clerks of a commission who are responsible for voter registration in each Pennsylvania county are required to undergo training by the Department of State and be certified in order to operate the SURE System. 4 Pa. Code § 183.9.

challenged; each and every signature line to which there was an objection and the basis for such objection; and the total number of signature lines which the parties stipulated should be stricken, or the objections thereto withdrawn. *Id.* The order also indicated that failure to comply with any of its provisions "may result in the imposition of monetary sanctions." *Id.* at 4.

After the entry of this scheduling order, due to the fact that the time scheduled for the hearing was two days *beyond* the deadline set by our Court for county boards of elections to send remote military-overseas absentee ballots, Objectors filed an application for emergency relief with the Commonwealth Court requesting that the hearing be rescheduled in accordance with the time deadlines established by our Court's order in *Carter*. That application was denied, and so Objectors turned to our Court for redress, by filing an emergency application for a writ of mandamus and/or extraordinary relief on March 25, 2022 to compel the Commonwealth Court to conduct all hearings and issue any decisions within the time periods set forth in our Court's order, which they viewed as mandatory, and, if not complied with, could result in erroneous ballots being mailed to remote military-overseas voters.

While this emergency application was pending, on March 24-25, 2022, Objectors and Candidate conferred with a SURE system operator. During this meeting, each of Objectors' challenged signature lines were jointly reviewed with the operator by counsel for Objectors and Candidate. Case Management Report, 3/29/22 (R.R. at 399a).[4] As a

---

[4] In this Case Management Report, which was filed with the Commonwealth Court, Objectors set forth their understanding of the parties' agreement as to the status of particular signature objections based on the completion of the review, and Candidate does not dispute Objectors' recounting therein of the timing and manner in which this process was conducted. Moreover, the transcript of the hearing held in this matter confirms that counsel for Objectors and Candidate reviewed the disputed signatures during this time process. *See, e.g.,* N.T., 3/29/22, at 197 ("[Counsel for Candidate]: This is [a challenge] I distinctly remember seeing during the meet and confer."); *id.* at 291 (continued…)

result of this review, Objectors agreed to withdraw their challenges to 89 signature lines, and Candidate agreed to stipulate that 148 signature lines were invalid. Objectors' Answer to Candidate's Fee Petition, 4/12/22, at 3 (R.R. at 655a). However, the parties could not reach agreement on the validity of the remaining signature lines which had been challenged by Objectors. Objectors informed Candidate that they intended to "follow up" on some of these challenges. *Id.*

At 3:00 p.m. on March 28, 2022, the Commonwealth Court issued a new scheduling order setting a hearing on the challenges for 10:00 a.m. the following day, before the Honorable Patricia McCullough. As a result of that rescheduling decision, our Court dismissed Objectors' application for emergency relief as moot, given that the Commonwealth Court would be timely holding the hearings pursuant to our Court's order in *Carter*. *In re Avery & Doyle*, 275 A.3d 946 (Pa. 2022) (order).[5]

At the commencement of the Commonwealth Court hearing, and based on Objectors' completion of their promised follow-up investigation of some of their signature line challenges, the parties stipulated that 148 of Objectors' signature line challenges were valid, and 239 other challenges would be withdrawn by Objectors. N.T., 3/29/22, at 53-54. This left 330 of Objectors' original 717 challenges unresolved. *In re Nomination Petition of Michael Doyle*, No. 119 MD 2022 (Pa. Cmwlth. filed April 5, 2022) (unpublished memorandum) ("*Doyle I*"), slip op. at 7, 10. Given these unresolved challenges, Candidate possessed only 873 valid uncontested signatures, which was 127 less than the statutorily required number of 1,000. *Id*. at 17. Both parties requested that the

---

("[Counsel for Objectors]: I confirm that we did look at all of these [signatures] and we had concerns at the meet and confer and could not reach an agreement with opposing counsel.").

[5] Justice Wecht authored a concurring statement to this order, joined by this author, Justice Donohue, and Justice Dougherty. *See In re Avery & Doyle*, 275 A.3d at 946-952 (Wecht, J., concurring). Justice Brobson also authored a separate concurring statement. *See id.* at 952-956 (Brobson, J., concurring).

Commonwealth Court rule on the validity of the remaining 330 signature line challenges. *Id.*

The grounds for each of these remaining challenges fell into one or more of the following categories: (1) the illegibility of the voter's signature, or other required nominating petition information, such as the voter's home address or date of signing, so as to render the signatory incapable of identification as a registered voter; (2) "In The Hand of Another" ("IHA") challenges, *i.e.*, challenges alleging that a signature or other required petition information was not actually entered on the petition by the signatory as is required by the Election Code, but rather by another person;[6] (3) duplication of signatures; (4) defects in the form of some signatures, such as not actually being the signature of the voter, but rather a printing of his or her name, or improper use of a nickname or initials; and (5) signatures not matching those on the voter's registration

---

[6] Section 2868 of the Election Code provides in relevant part:

> Each signer of a nomination petition shall sign but one such petition for each office to be filled, and shall declare therein that he is a registered and enrolled member of the party designated in such petition . . . He shall add his address where he is duly registered and enrolled, giving city, borough or township, with street and number, if any, and shall legibly print his name and add the date of signing, expressed in words or numbers[.]

25 P.S. § 2868.

If a voter's signature, or entry of the other information required by this section on a signature line of a nominating petition is determined not to be genuine, the Commonwealth Court has ruled that the signature line must be stricken. *In re Morrison-Wesley*, 946 A.2d 789, 796 (Pa. Cmwlth. 2008). However, in situations where one person signs and supplies the requisite information for himself on a nominating petition, and also does so on behalf of another, such as when a husband signs and completes a petition signature line himself, and then does so on behalf of his wife, the validly signed and completed line will be counted, and the other must be rejected. *Id.*

cards.  Case Management Report, 3/29/22, at 11-23.[7]  Two SURE system operators were present in the courtroom for the hearing.

Before the parties and the court addressed the outstanding challenges, Candidate made an overarching due process challenge, contending that the expedited nature of the hearing hindered his ability to prepare.  N.T., 3/29/22 at 11, 14.  More specifically, Candidate averred that, because many of the objections as to the validity of signatures necessitated the examination of a voter's signature, expert testimony would be necessary to make a proper handwriting analysis.  *Id.* at 93-94.  Alternatively, Candidate argued that he should be permitted to offer the testimony of individual voters to verify they had, in fact, signed the petition and entered all information required by the Election Code thereon.[8] *Id.*

Objectors countered that such expert or witness testimony was not required and that the court was competent to make the necessary "common sense" evaluations of the signatures.  *Id.* at 95.  Ultimately, the court did not require either the testimony of an expert or individual voters and it proceeded to adjudicate the challenges based on the information in the SURE system as well as the nominating petitions; however, the court also indicated it was reserving judgment on Candidate's challenge to this procedure, and noted its concern "that there is nothing else for the Court to look at a SURE card and a petition, which I don't know, they may sign their name differently".  *Id.* at 103.

---

[7] Objectors also made a global challenge to invalidate signatures on page 56 of candidate's nominating petition because the signature of the circulator did not match the one in the SURE database.  However, based on the testimony of Candidate's election consultant and an affidavit of the circulator introduced at the hearing, the court concluded that the circulator's signature was valid; hence, the court rejected this global challenge. *Doyle I*, slip op. at 28.  All but five of those signature lines were also the subject of individual challenges, and the court separately ruled on those signatures.
[8] *See supra* note 1.

Candidate also challenged Objectors' standing to maintain this action to set aside his nominating petition. Specifically, he claimed that Objector Sloss was not a resident of the 12th Congressional District, but, rather, the 17th Congressional District, and that he could not confirm that Objector Zelekovitz was a registered elector in the 12th Congressional District. *Id.* at 17. Further, Candidate contended that neither Objector had standing because they lacked a substantial interest in the outcome of this case, given that, if they were successful, there would be no one for them to vote for in the primary election. *Id.* at 18.

Objectors countered by asserting that all that was required for an individual to have standing to bring a challenge to a nominating petition under our Court's decision in *In re Samms*, 674 A.2d 240 (Pa. 1996), is that the individual be registered in the district holding the primary election and have membership in the political party for which the candidate is seeking nomination.[9] Thus, Objectors contended that consideration of the additional factors Candidate suggested was irrelevant. N.T., 3/29/22, at 22.

Although the court indicated it would reserve final judgment on this question as well, pending further briefing of the parties, the court nevertheless took testimony from both Sloss and Zelekovitz. Sloss testified that he was a registered Republican who previously lived at an address in the 17th Congressional District, but that he had recently moved with his family to a residence with an address in the 12th Congressional District and changed his voter registration information to reflect this new address; however, he remained a registered Republican. *Id.* at 82, 85-86. His current address in the 12th Congressional District was confirmed by the SURE system operator, who likewise

---

[9] *See Samms*, 674 A.2d at 242 (holding that "to have standing to challenge a nomination petition, one must be registered to vote in the district holding the primary election and be a member of the political party to which the nomination pertains. . . there are no other requirements.")

confirmed Zelekovitz was a registered Republican living in the 12th Congressional District. *Id.* at 68, 83.

With respect to the court's consideration of the remaining 330 contested challenges, this process involved the retrieval of relevant voter registration information from the SURE system, which was displayed on a viewing screen in the courtroom, along with copies of the nominating petitions, after which counsel for Objector and Candidate offered argument to the court regarding the merits of each particular challenge.[10] In the course of this process, which lasted through the afternoon and evening hours of March 29, and resumed again the morning of March 30, the parties and the court sequentially addressed these challenges.

The first group of challenges involved the illegibility of the signatures and/or required information on the petition and the voter's registration card. However, the parties also addressed other challenges to signatures in this group: that they were facially invalid because they did not match those which appeared on the voter's registration card — "a signature mismatch"; that the writing of the signature or other information was done in the hand of someone other than the putative signatory (IHA); that the voter improperly used initials when signing; or that the signatures were duplicates appearing elsewhere on the petition. For several signature lines there were multiple challenges on these various grounds. *Id.* at 102-133.

In order to verify that a petition signatory was a registered voter living at the address entered on the petition, and who properly signed the petition and entered the correct required information thereon, the SURE system operator looked up the signer's name and/or address in the SURE system. The operator often was directed, either by

---

[10] During this examination, the court relied on the original nominating petitions, which it possessed, the writing on which it described as "a little clearer" than the copies used by the parties. N.T., 3/29/22, at 121.

counsel for the parties or the court, to enter various permutations of proper name spellings and addresses into the SURE system, in order to determine if a valid voter registration card existed which corresponded to the signature and required information as entered on the nominating petition. During this process, if a registration card was found and displayed by the SURE system operator which satisfied Objectors that a disputed signatory was validly registered, and that he or she had properly signed the petition and entered other required information thereon, the Objectors withdrew the objection and stipulated to the signature's validity. Likewise, if efforts to find a registered voter proved fruitless, or the signature and information contained in the SURE system did not match that which was entered on the petition, Candidate stipulated to the invalidity of the signature. *Id.*

When the search results yielded no conclusive evidence satisfactory to both parties, the court heard often vigorous argument from respective counsel comparing various structural features of the handwriting and printed information on the petition with that in the SURE database. *Id.* At the conclusion of this phase of the hearing, due to the stipulations of the Objectors and the Candidate as to the validity or invalidity of signatures based on the information retrieved from the SURE system, as well as rulings of the court, it was determined that Candidate had 896 valid signatures. *Id.* at 133.

The parties next addressed a group of challenges to multiple pairs of signature lines, which were based only on IHA grounds, although many of those signature lines were also challenged on other bases as well, such as being duplicates, or signature mismatches. *Id.* at 134-73. After visual inspection of the petition signatures and the corresponding information in the SURE file for each of these pairings, Objectors and Candidate once more stipulated to the results of some of the disputed challenges – *i.e.*, that both, one, or none of the pairs of signatures should be counted – and, absent such

stipulations, the court, after considering the parties' competing arguments, again ruled on the challenge, or deferred a final decision thereon. At the completion of this evaluation process, because of the parties' stipulations and court rulings, it was calculated by mutual agreement of the parties and the court that Candidate had 926 valid signatures. *Id.* at 174-75.

At this point, Objectors suggested that the court address the remaining signature challenges on a line by line basis, inasmuch as many of them were the subject of multiple challenges as this procedure would enable the court to consider these myriad challenges "once and for all." *Id.* at 176. The court heeded that suggestion, and the parties and the court began to sequentially review all challenges made to the remaining disputed signature lines, again utilizing the same procedures described above.

Thus, once more, the parties reviewed the petition signatures and the corresponding information after the operators located it in the SURE database and displayed it on the viewing screen in the courtroom. As before, the SURE system operator was frequently prompted by the parties' counsel and the court to enter multiple proposed spellings of the voter's name and different suggested addresses in order to find and display the SURE system information. Again, both parties conceded the validity or invalidity of some of the signature line challenges based on the information located by the operator, presented arguments on the ones they would not stipulate to, and the court either issued a ruling or reserved judgment on them. *Id.* at 176-212.

Notably, however, with respect to challenges based on the facial invalidity of a signature, or the signatory using initials or otherwise not providing a full signature, Candidate renewed his earlier due process objection that it would be "unfair" to have signature lines declared invalid on these grounds because the truncated timing of the hearing precluded him from offering rehabilitative evidence, such as affidavits or voter

testimony. *Id.* at 213. While not expressly ruling on this objection, the trial court seemingly accepted Candidate's argument that due process required the opportunity for the candidate to establish the validity of a signature via witness or affidavit, as, thereafter, it rejected 14 such challenges in whole or in part on the basis of "due process," reasoning that the expedited timing of the hearing deprived Candidate of the opportunity to secure such rehabilitative evidence. *Id.* at 213, 225, 232, 235-38, 240-43.

Additionally, Objectors voluntarily withdrew 16 challenges to signature lines, based on the voter having "flipped" his signature (signing in the box provided for the voter's printed name and printing his name in the signature box). Objectors agreed to do this because of Candidate's argument to the court, raised for the first time during the hearing, that a signature line executed in this fashion had been previously ruled valid by the Commonwealth Court. *Id.* at 210-11, 232 (citing *In re Thompson*, No. 500 C.D. 2014 (Pa. Cmwlth. April 8, 2014) (unpublished memorandum)).

Thus, by the close of the hearing on March 29, 57 additional challenged signature lines were determined by stipulation of the parties or court rulings to be valid, leaving Candidate with 973 valid signatures — 27 short of the required 1,000. *Id.* at 245.

When the hearing resumed on March 30, this sequential evaluation of the remaining disputed signature lines by the parties and the court continued as described above. After the court made multiple rulings in Candidate's favor regarding disputed signature lines alleged to have been facially invalid, in whole or in part on the basis of due process, and after Objectors withdrew three challenges which were based on the validity of the voter's registration information which had not been previously confirmed at the initial meet and confer, but apparently located by the SURE system operator at the hearing, the parties agreed that Candidate possessed the requisite 1,000 valid signatures. *Id.* at 297. Nevertheless, given the compressed time frame under the revised

election calendar, the court continued the hearing, opining that it was appropriate to afford a sufficient "cushion" in the event its decisions on individual objections were overturned on appeal. *Id.* at 385. Candidate agreed. *Id.* at 439.

Consequently, for the balance of the hearing, which ended at 9:20 in the evening, the court issued further rulings on outstanding challenges. As before, when the court ruled on challenges based on facial validity, it rejected the majority of them in whole or in part on the basis of due process. *Id.* at 298-532. Objectors also withdrew several additional challenges which were based on various asserted grounds *See, e.g.*, *id.* at 423, 427. At the completion of the hearing, according to the calculations of counsel and the court, Candidate had 1,146 valid signature lines. *Id.* at 532.[11]

At the close of the hearing, the court directed that the parties file briefs addressing the issues raised by Candidate concerning Objectors' standing to maintain an action to set aside his nominating petition, and his due process challenge to the propriety of the court ruling on facial challenges to signature lines in the absence of expert handwriting or voter testimony. N.T., 3/30/22, at 521. At that time, counsel for Candidate informed the court that he would be putting an additional issue in the brief relating to "costs," and the court responded, "[y]ou'll have to file that." *Id.* at 524.

Objectors and Candidate both filed briefs with the Commonwealth Court on March 31, 2022. In his brief, Candidate included a section in which he argued that the court should award "*costs*" under Section 2937,[12] because, in his view, Objectors "should have known that the chance of success on their Petition was remote" and that Objectors were not prepared to meet their burden because they had allegedly failed to review their

---

[11] This tally was ultimately the court's final determination of the number of valid signature lines possessed by the Candidate. *Doyle I, slip op.* at 32.

[12] *See* 25 P.S. § 2937 ("In case any such petition is dismissed, the court shall make such order as to the payment of the *costs* of the proceedings, including witness fees, as it shall deem just." (emphasis added)).

objections before the hearing. Candidate's Post-Hearing Memorandum of Law, 3/31/22, at 29-30.

In response to Candidate's request for costs, Objectors filed an application for emergency relief on April 1, 2022, asking that the court strike that section of Candidate's memorandum, given that they understood the court to have directed Candidate to file a separate motion for costs, and, because they expected the issue to be raised by motion, they did not address this issue in their own brief. Objectors asked the court to direct Candidate to file a separate motion to address this issue, or, in the alternative, that they be given leave to respond to Candidate's arguments on this issue after receipt of the transcript of the proceedings. Application for Emergency Relief, 4/1/22 (R.R. 599a).

The next day, the Commonwealth Court issued an order denying Objectors' Petition to Set Aside Candidate's nominating petition. The order also denied Objectors' application for emergency relief. The order further stated:

> Costs and *attorneys fees* [sic] incurred by Candidate Michael Doyle are assessed against Objectors Eric Sloss and Sandor Zelekovitz. *See* Section [2937] of the Pennsylvania Election Code, Act of June 3, 1937, P.L. 1333, as amended, 25 P.S. §2937 (authorizing the court to "make such order as to the payment of costs of the proceedings ... as it shall deem just").

Commonwealth Court Order, 4/2/22 (emphasis added). Additionally, the order directed the Candidate to file a "bill of costs" within 5 days. *Id.*

On April 5, 2022, the court filed an opinion, later amended that same day, in which the court addressed the standing issue and stated its rationale for awarding costs *and* counsel fees.

On the issue of whether Objectors had standing to maintain their action to set aside Candidate's nominating petition, the court found that, while Candidate had made a "notable argument that Objector Sloss failed to adduce sufficient, credible evidence to

establish the fact that he 'resided' in the district on the date the Petition was filed, Candidate admits that the other objector, Objector Zelekovitz, demonstrated that he had standing as a matter of fact." *Doyle I*, slip op. at 5. While the court recognized that it was bound by our Court's decision in *In re Samms*, *supra,* it nevertheless expressed discomfort at what it perceived to be Objectors' motivation for filing the Petition:

> [T]he fact that an objector seeks to disqualify the only candidate of his political party affiliation that is running in the primary provides this Court with grave concern that the objector can only be advancing the agenda and goals of the Democratic Party, thereby jeopardizing the bright line of demarcation in primary election voting between the Democratic and Republican Parties in Pennsylvania and implicating the rule that a registered Democrat lacks standing to challenge a nomination petition filed by a Republican.

*Doyle, I*, slip op. at 5-6.

Regarding its decision to award costs and counsel fees, in a section of its opinion entitled "Costs," the court gave the following explanation for why it had awarded both costs and counsel fees:

> In Court and in his post-hearing memorandum of law, Candidate requested an award of costs and attorney's fees, pursuant to section [2937] of the Election Code, on the ground that "Objectors should have known that the chance of success on their Petition was remote, as evidenced by the manner in which the proceedings unfolded." (Candidate's Mem. of Law at 29-30.)[13] By order dated April 2, 2022, this Court granted Candidate's request and provides the following in support of its determination. . . .
>
> Under section [2937] of the Election Code, in the event a petition to set aside "is dismissed, the court shall make such order as to the payment of the costs of the proceedings, including witness fees, as it shall deem just." 25 P.S. §2937. Although the Election Code does not permit an automatic

---

[13] Our independent review of the certified record indicates that Candidate made no such request for counsel fees in his post-hearing memorandum, or at any other time prior to the court's award of such fees in its April 2 order.

award of costs to the prevailing party on a petition to set aside a nomination petition, costs may be awarded where fraud, bad faith, or misconduct by the losing party is shown, or where it is shown that the losing party should have known that the chance of success was remote or that his legal position was foreclosed by existing law. *Morley v. Farnese*, [*infra*].

Here, after requesting an expedited trial, Objectors' attorney represented to the Court that he was fully prepared to present Objectors' case, had reviewed the SURE cards, and had a good faith basis for doing so. As the hearing unfolded, however, it became readily apparent to the Court that Objectors were not prepared to present those objections which remained in dispute after the parties' preliminary consultation with the SURE System operator and the parties' stipulation that was entered at the beginning of hearing. Importantly, after the stipulations were entered into the record, Candidate had **1,203** presumptively valid signatures and there were only **330** signatures in dispute - not **717**. During the hearing, Objectors occupied an extremely considerable amount of the Court's and Candidate's time in reviewing and assessing the information on the SURE System and/or the signatures on the Nomination Petition, which they were to have done prior to the trial based on this Court's Case Management Order of March 23, 2022, only to concede to the Court, after conducting such review, that another **112** signatures were indeed valid and withdrew their various objections to those signature lines as meritless. Consequently, Objectors withdrew approximately half of their objections at trial, in essence, without the need for any ruling on any signature line by the Court.  Taking into account the objections based on "in the hand of another" - Objectors should have accounted for the additional valid lines as discussed above and acknowledged that Candidate had enough signatures to be on the ballot.

In these circumstances, the Court finds that Objectors contravened the Court's Order that the parties, in a good faith effort, were to meet and confer with the SURE System operator before the hearing in order to winnow down needless objections that had no basis in fact or law. In the Court's view, this was not a close case. The Court finds Objectors did not exercise good faith in this challenge based on their failure to concede **before trial** that Candidate undisputedly had 985 valid signatures, only 15 short of the 1,000 signatures he needed to be on the ballot, based on Objectors' own

stipulations and withdrawals. Moreover, as explained above, Objectors should have known that if the Court sustained challenges to all 24 sets of their "in the hand of another challenges," at the very least, 24 more valid signature lines would be added to Candidate's total number of valid signatures, bringing the total to 1,009 valid signatures. Objectors could have, and should have, winnowed down their objections **before trial**, instead of compelling the attendance of multiple Court staff, two SURE operators, a court reporter, and sheriff and Candidate, his witness and his attorneys while they did so. Objectors should have known that their Petition to Set Aside was frivolous and their chance of success nearly (if not) non-existent[.]

That said, the Court reiterates its finding that Objectors unnecessarily expended a vast amount of judicial resources. Given the lack of any legal foundation for the Petition to Set Aside, and the fact that if successful there would be no Republican candidate on the ballot for the primary, the Court is left with the impression that Objectors sole motive in pursuing this matter was to disqualify the only potential Republican candidate for the 12th District that they could vote for in the primary election, even though Objectors, quite curiously, testified that they intended to vote for a Republican candidate in the primary. [] Paradoxically, the goal of this litigation appears to the Court to be nothing more than a futile attempt by Objectors to negate their own right to vote in the upcoming primary election.

For these reasons, the Court granted Candidate's request for attorney's fees and costs under section [2937] of the Election Code.

*Doyle I, slip op.*, at 29-32 (emphasis and alterations original).

The court made no specific ruling on the questions of whether Objectors were required to present expert testimony to establish their facial validity challenges to signature lines, or whether the court was required, as a matter of due process, to provide Candidate with the opportunity to respond to such challenges through the use of expert or witness testimony, and the court's opinion included no discussion of these questions.

Nevertheless, the court twice observed in its opinion that Objectors did not present any expert testimony on any category of signature challenge. *Id.* at 4, 26.

On April 7, 2022, Candidate filed a "Fee Petition" rather than the bill of costs ordered by the Commonwealth Court. Therein, he requested, for the first time in this litigation, that he be awarded counsel fees under 42 Pa.C.S. § 2503(7), which establishes the entitlement of a participant in a matter to "payment of a reasonable counsel fee" if he or she "is awarded counsel fees as a sanction against another participant for dilatory, obdurate or vexatious conduct during the pendency of [the] matter." Candidate averred that the court had discretion to award such fees because the Petition was denied, and that he was entitled to $78,117 in counsel fees "as a direct result of having to defend this matter on behalf of Candidate." Doyle Fee Petition, 4/7/22, at 2 (R.R. at 643a). Candidate also sought the award of $4,515.50 in costs for travel expenses, meals, and mileage. *Id.* Candidate later filed an Amended Fee Petition seeking an additional $3,898.35 in transcription costs. Amended Fee Petition, 4/18/22.

Objectors filed an answer to the Fee Petition on April 12, 2022, in which they contended that, under 42 Pa.C.S. § 1726(a)(1), counsel fees are not recoverable as taxable costs by a litigant, except in the limited circumstances enumerated in the section, one of which is when they are authorized by 42 Pa.C.S. § 2503. 42 Pa.C.S. § 1726(a)(1).[14] Objectors noted that 42 Pa.C.S. § 2503(10) permits recovery "in such

---

[14] This section provides in relevant part:
> (a) Standards for costs.**--**The governing authority shall prescribe by general rule the standards governing the imposition and taxation of costs, including the items which constitute taxable costs, the litigants who shall bear such costs, and the discretion vested in the courts to modify the

(continued…)

circumstances as may be specified by statute," but the statute relied on by the court, Section 2937 of the Election Code, did not authorize the imposition of such fees.

Objectors also responded to Candidate's claim raised in his Fee Petition that imposition of counsel fees was warranted under Section 2503(7). Objectors averred that the record did not support a finding that their conduct in the litigation was dilatory, obdurate, or vexatious as required to justify the award of such fees.

On June 23, 2022, the Commonwealth Court issued an order awarding Candidate $78,117.00 in counsel fees and $3,898.35 in costs "pursuant to Section [2937] of the Pennsylvania Election Code and sections 2503 (7) and (9) of the Pennsylvania Judicial Code, 42 Pa.C.S. § 2503(7) and (9)." Commonwealth Court Order, 6/23/22. Objectors appealed this order to our Court.

The Commonwealth Court authored a supplemental opinion in support of its June 23, 2022 order. *In re Nomination Petition of Michael Doyle*, No. 119 MD 2022 (Pa. Cmwlth. filed June 23, 2022) (unpublished memorandum) ("*Doyle II*"). Therein, the court concluded that, because Objectors failed to appeal its April 2, 2022 order, Objectors waived any challenge to its imposition of counsel fees "and are now barred from challenging the imposition of fees." *Doyle II*, slip op., at 8. The court further opined that

---

amount and responsibility for costs in specific matters. All system and related personnel shall be bound by such general rules. In prescribing such general rules, the governing authority shall be guided by the following considerations, among others:
    (1) Attorney's fees are not an item of taxable costs except to the extent authorized by section 2503 (relating to right of participants to receive counsel fees).

42 Pa.C.S. § 1726(a)(1).

Objectors could have appealed its determination that they acted in bad faith after it issued its amended opinion on April 5 explaining the rationale for its order, but they did not.

Because of its finding of waiver, the court explained its rationale for making its award for counsel fees "by way of background only." *Id.* Although the court acknowledged that the Commonwealth Court had previously determined, in *In re Nomination Paper of Rogers*, 942 A.2d 915 (Pa. Cmwlth. 2008), that Section 2937 of the Election Code did not authorize the imposition of counsel fees, the court noted that counsel fees had been awarded in that case under Section 2503(7) because of the conduct of the candidate. *Doyle II*, slip op., at 9. The court concluded that an award of counsel fees was likewise warranted in the instant matter under Section 2503(7) and 42 Pa.C.S. § 2503(9)[15] and cited some of the prior findings made in its April 5 opinion, as factors supporting its award:

> (1) Objectors did not have a reasonable factual or legal basis to file the petition to set aside; (2) Objectors failed to comply with this Court's direction that they adequately review the SURE System and advise candidate's counsel of the necessary withdrawal of invalid challenges, and ended up withdrawing over 100 challenges in open court in addition to

---

[15] These provisions state in relevant part:
> § 2503. Right of participants to receive counsel fees
> The following participants shall be entitled to a reasonable counsel fee as part of the taxable costs of the matter:
>
> * * *
>
> (7) Any participant who is awarded counsel fees as a sanction against another participant for dilatory, obdurate or vexatious conduct during the pendency of a matter.
> * * *
> (9) Any participant who is awarded counsel fees because the conduct of another party in commencing the matter or otherwise was arbitrary, vexatious or in bad faith.

42 Pa.C.S. § 2503(7), (9).

the 239 challenges withdrawn as the result of pre-trial stipulations; and (3) Objectors ultimately conceded that over 1,000 signatures were valid, which meant Candidate had more than enough valid signatures to remain on the ballot and indicated that no objection should have been made to these signatures. Objectors' failure to make these concessions before filing the petition to set aside, or withdrawing it per stipulation, thus necessitated Candidate spending an additional two full days in court until almost 10:00 p.m., and incurring unnecessary costs for legal counsel and transcripts, let alone the resultant necessity of participation by the court reporter, SURE System operators, deputy sheriffs, court crier and other staff, during an intensely busy election season. In this Court's view, this clearly constitutes dilatory, obdurate, and vexatious conduct and bad faith during the pendency of and in commencing this matter.

*Doyle II*, slip op. at 10-11.

The court rejected Objectors' argument that they withdrew many of their challenges only after the court had issued rulings which it had made earlier in the hearing, something that they could not do before trial. In the court's view, even if this were the basis for their withdrawal, "that means Objectors ultimately agreed with the Court that there was no initial basis for the challenge." *Id.* at 11.

Additionally, the court found that Objectors had acted in bad faith merely by *filing* the Petition, opining:

Candidate is the only candidate in the Republican party who is running for the Office of Representative in Congress for the 12th Congressional District in Pennsylvania. Both Objectors testified that they intended to vote in the primary election. Both Objectors admitted at the hearing, if their petition to set aside were successful, **there would be no candidate for the Republican Party in the May primary**. One Objector even admitted that he **changed his voter registration from Democratic to Republican on the day the petition to set**

**aside was filed**.[16] Thus, by their own admissions, Objectors' proposed remedy for the primary election would result in no Republican candidate on the ballot to vote for. As stated in our prior opinion, we have serious concerns about whether Objectors filed their petition to set aside in good faith[.]

*Id.* at 11-12 (emphasis original).

On appeal to our Court, Objectors now assert that the Commonwealth Court abused its discretion by awarding counsel fees under Sections 2503(7) and (9) of the Judicial Code. Objectors Brief at 2.[17]

## II. Waiver

Before turning to the merits of this issue, we must first determine whether it has been properly preserved for our review, inasmuch as the Commonwealth Court found, and Candidate presently argues, that it has been waived due to Objectors' failure to file an appeal from the Commonwealth Court's April 2, 2022 order in which it awarded costs as requested by Candidate, and *sua sponte* awarded Candidate counsel fees.

Objectors argue that they have not waived their claim by failing to appeal the Commonwealth Court's April 2, 2022 order, given that it was not a final appealable order: while it awarded costs and counsel fees, it did not specify the amount of either. Objectors stress that it was not until the court's June 23, 2022 order that it specified these amounts. Objectors posit that, under *In re Nader*, 905 A.2d 450, 457 (Pa. 2006) (where Commonwealth Court issued two orders, one assessing costs against a litigant and the

---

[16] Our independent review of the record does not support this finding. As we recounted earlier, Objector Sloss testified that he had changed his registration on his voter registration card to reflect the fact that he had moved into a new residence in the 12th Congressional District, but he testified that he *did not* change his party affiliation, as he remained a registered Republican.

[17] Objectors do not challenge the portion of the court's order awarding $3,898.35 for the costs of the hearing below.

second directing the litigant to pay a specific dollar amount based on invoices submitted to the court after the issuance of the first order, only the second order is final and appealable), only the Commonwealth Court's June 23, 2022 order was a final appealable order. Objectors Brief at 14.

Objectors submit that an appeal from the April 2 order would have been interlocutory, and they were under no obligation to seek permission to file an appeal from an interlocutory order, particularly when our Court has made plain that such piecemeal litigation is disfavored. *Id.* (citing *Basile v. H and R Block*, 973 A.2d 417 (Pa. 2009) (failure to file permissive interlocutory appeal pursuant to Pa.R.A.P. 1311 does not result in waiver of issue in appeal from final order); *Pa. Bankers Association v. Pa. Department of Banking*, 948 A.2d 790, 798 (Pa. 2008) (emphasizing Pennsylvania's policy of discouraging piecemeal litigation)).

Moreover, Objectors highlight the fact that the April 2, 2022 order made no reference to awarding counsel fees under Section 2507, but rather the court therein improperly awarded such fees under Section 2937 of the Election Code. Objectors note that Candidate only sought such fees pursuant to Section 2503(7) in his Fee Petition, which was filed after the entry of the court's April 2 order, and the court first ruled that such an award was appropriate under that provision, as well as Section 2503(9), in its June 23, 2022 order. Thus, Objectors contend, this appeal represents their first opportunity to contest those statutory grounds for the award, as well as the specific dollar amount fixed by the court.

Candidate responds by averring that, typically, counsel fees are sought only after a court issues a final order resolving the merits of the case, and concedes that, in such

instances, the order awarding fees is not final until the Court specifies the amount of the fees, given that, when the request for fees is made by motion after the entry of an order adjudicating the merits of the case, it is treated as a separate or ancillary matter from the underlying action. Candidate Brief at 20 (citing *Old Forge School District v. Highmark*, 924 A.2d 1205 (Pa. 2007) (treating appeal from counsel fees order as a separate, ancillary matter because question of counsel fees was not disposed of in prior order dismissing underlying matter)). However, Candidate contends that this case is unlike *Old Forge* or *In re Nader*, *supra*, because, in Candidate's view, the question of the appropriateness of the imposition of counsel fees was not addressed by a separate order, but rather was fully adjudicated by the Court's April 2 order, and that, in its April 5 opinion, the court "made the requisite findings of fact and conclusions of law . . . to support its fee[] award." Candidate Brief at 21. Thus, Candidate argues that the merits of the court's counsel fee decision should have been challenged in an appeal from the April 2 order, and so he agrees with the Commonwealth Court's conclusion that Objectors' present claim is waived.

Our Court "has only that jurisdiction as is provided by law." *In re Nader*, 905 A.2d at 457 (internal quotation marks omitted). Our jurisdiction over appeals from the Commonwealth Court is conferred by 42 Pa.C.S. § 723, which limits our jurisdiction to "appeals from *final* orders . . . entered in any matter which was originally commenced in the Commonwealth Court." 42 Pa.C.S. § 723 (emphasis added). Thus, our Court has no jurisdiction to review an order of the Commonwealth Court in matters such as this one unless it constitutes a final order, as defined by Pa.R.A.P. 341(d)(1) – that is, unless it "disposes of all claims and all parties." *In re Nader*, 905 A.2d at 457 (quoting Rule

341(d)(1)). Stated another way, the order must *completely* dispose of all claims raised in the entire case. *Id.*

In this matter, the court's April 2, 2022 order denied Objectors' Petition but did not completely dispose of Candidate's claim for counsel fees, which Candidate had theretofore not made. As discussed previously, the court *sua sponte* raised and interjected the counsel fees issue into the case in that order. While the April 2 order generically "assessed" counsel fees on Objectors, it quite plainly did not establish *the amount* of such fees, which was presumably to be fixed by the court at a later point in time; thus, because that order did not finally dispose of that claim, it was interlocutory in nature. Consequently, Objectors could not have appealed that order as a matter of right to our Court at that time. Pa.R.A.P. 341(d); 42 Pa.C.S. § 723.[18] Moreover, Objectors were not obligated to seek permission to appeal the April 2 order under Pa.R.A.P. 1311 in order to preserve their challenges to it, given that, as we have made clear, such review is permissive not mandatory. *Basile*, 973 A.2d at 422 n.6.

---

[18] We also reject Candidate's assertion that the Commonwealth Court's April 5, 2022 opinion fully addressed his entitlement to counsel fees and furnished a basis for Objectors to appeal at that time. First, Section 2937 of the Election Code which the court relied on therein as its basis for assessing counsel fees does not, by its plain terms, confer any authority on a court to impose such fees. *In re Nomination Paper of Rogers*, 942 A.2d 915, 927-28 (Pa. Cmwlth 2008); *City of Wilkes-Barre v. Urban*, 915 A.2d 1230, 1234 (Pa. Cmwlth. 2007). Additionally, the court's April 5, 2022 opinion does not reference, nor discuss, the specific statutory grounds for the court's subsequent award of those fees, Sections 2503(7) and (9) of the Judicial Code. Most importantly, however, Candidate's argument contravenes the fundamental principle that an appeal cannot be taken from an opinion authored by a court, but only from an order. *Cohen v. Jenkintown Cab Company*, 446 A.2d 1284, 1290 n.4 (Pa. Super. 1982) (an appeal to a higher court is from the order of the lower court, not its opinion); *White v. W.C.A.B. (Denny)*, 648 A.2d 361, 365 n.4 (Pa. Cmwlth. 1994) ("It is always the judgment of the lower court or order of the administrative agency that is appealed, not the opinion or rationale underlying the judgment or order.").

Accordingly, it was not until the court's June 23, 2022 order which directed Objectors to pay $78,117.00 in counsel fees (and $3,898.35 in costs) that the counsel fees issue was finally disposed of. *See In re Nader*, 905 A.2d at 457 (order "which established the amount that the Appellants were required to pay [] ended the litigation and is a final order from which an appeal was permitted"). Thus, given that the June 23, 2022 order was the final order in this matter, it was appealable as of right by Objectors and, having timely filed such an appeal, they are entitled to appellate review of their claim, arising out of that order, that the Commonwealth Court's imposition of $78,117 in counsel fees constituted an abuse of discretion. We will therefore proceed to consider this issue.

### III. Arguments of the Parties

Objectors aver that the imposition of counsel fees by the Commonwealth Court was an abuse of discretion, as the evidence of record did not support its award of such fees under either Section 2503(7), or Section 2503(9). First, Objectors reject the Commonwealth Court's conclusion that they somehow acted in bad faith by filing this Petition for an improper political purpose. Objectors note that, under our caselaw, a litigant can be charged with filing a lawsuit in bad faith if they file the suit "for purposes of fraud, dishonesty, or corruption," Objectors Brief at 18 (quoting *Thunberg v. Strause*, 682 A.2d 295, 299 (Pa. 1996)), and they contend that the record demonstrates no such improper purposes in their bringing of this lawsuit. To the contrary, they maintain that the Commonwealth Court's conclusion that they acted in bad faith rests on findings it made which are "erroneous and legally irrelevant to the bad faith analysis." *Id.* at 19.

Specifically, they point to the court's erroneous finding that Objector Sloss had changed his voter registration from Democratic to Republican on the day the Petition was

filed, which they aver was plainly wrong, as both his testimony and that of the SURE System operator confirmed that he had only changed his registration to reflect his current *address* in the 17th Congressional District, and that he remained, as he always had been, a registered Republican. Thus, Objectors contend that this error undermined the court's conclusion regarding Objectors' putative bad faith motive in bringing this action — to disqualify the only Republican candidate on the ballot and to "advanc[e] the agenda and goals of the Democratic Party." *Id.* at 18

Further, according to Objectors, the court's contention that if Objectors were successful they would have no candidate to vote for is misplaced. Objectors point out that nomination petition challenges serve an important interest, which is to ensure that a candidate has demonstrated an adequate level of support from party members to be placed on the ballot. They assert that the Election Code does not require a party's voters to accept a nominee who cannot meet the Election Code's legal requirements, nor does it guarantee a right to vote for or against a particular candidate. Additionally, Objectors note that the court failed to acknowledge that, in the event Candidate was disqualified from the ballot, primary voters retained the option to write in a qualified person of their choice.

Most importantly, according to Objectors, the allegation of their purported motive is legally irrelevant to the question of whether they acted in bad faith by filing the petition to challenge Candidate's nominating petition. Objectors point out that our Court has specifically held in *In re Samms*, that factors, such as "the challenger's underlying intentions and motivations . . . are simply not relevant when the requirements of standing . . . have been met." Objectors Brief at 21 (internal quotation marks omitted) (quoting *In*

*re Samms*, 674 A.2d at 242).  Thus, in that case, even though there was credible evidence that the challenge to the Democratic candidate was done at the behest of members of the Republican Party, we deemed that evidence insufficient to defeat the challenger's suit to set aside the nominating petition.  Objectors reason that, if evidence that a challenger sued at the *direction* of the opposing party is insufficient to defeat the challenger's standing to bring and maintain the suit, such a motive certainly cannot support a finding that the challenger, in bringing the suit, was acting in bad faith so as to justify the award of counsel fees.

Objectors next aver that their conduct was not vexatious as our Court has defined that term – namely, that the litigant bringing the suit filed it "without sufficient grounds in either law or in fact and if the suit served the sole purpose of causing annoyance." *Thunberg*, 682 A.2d at 299.  Objectors remind that our Court has mandated that, in order for a court to conclude that conduct is vexatious, it must make specific findings that support both prongs of the *Thunberg* test, and, thus, the court below needed to make a specific finding that "the suit served the sole purpose of causing annoyance."  *Old Forge*, 924 A.2d at 1213.  Objectors argue that, because the court in this matter did not make this requisite finding, its conclusion that their conduct was vexatious is unsupported by the record.

Objectors then proceed to address the specific factors enumerated in the court's June 23, 2022 opinion, which it relied on to support its award of counsel fees.  First, Objectors argue that they had an adequate basis in law and fact to file the petition.  They submit that in election challenges of this nature, the reality that both parties must operate under the compressed mandatory timing deadlines afforded by the Election Code must

be acknowledged. Objectors Brief at 23-24 (citing *In re Farnese*, 17 A.3d 357 (Pa. 2011)). They emphasize that, in the instant matter, those already short timelines were further reduced as a result of this Court's adoption of a congressional redistricting map following the impasse between the legislative and executive branches, and concomitant adjustment of the election calendar. They note that the time available to them was further reduced because they were required to seek emergency and expedited relief in order to have their Petition heard and adjudicated within the mandatory deadlines established by our Court's order in *Carter*, *supra*, and due to the Commonwealth Court's decision to abruptly reschedule the hearing in this matter with only hours' notice.

Objectors point out that, despite these "difficult circumstances," they nonetheless "conducted an extensive pre-filing review" of the 1,351 petition signatures; performed their own review of the SURE system; and complied with the Commonwealth Court's directive that they meet and confer with counsel for Candidate and a SURE system operator for nine hours over a two-day period, during which time they mutually reviewed the challenged signature lines with Candidate's counsel and "substantially" winnowed down some of the challenges. *Id.* at 25-26. Objectors aver that this demonstrates that they complied with the Commonwealth Court's scheduling order to the fullest extent possible under the accelerated time frame they were working under.

Objectors therefore strenuously dispute the court's conclusion that they had contravened the court's order directing them to do so, as they contend it is unsupported by the record, which indicated that the parties "confirmed to the court that they met and conferred and reviewed each challenged signature in the SURE system." *Id.* at 26-27 (quoting N.T., 3/29/22, at 197 ("[Counsel for Candidate] . . . We went through nearly 1300

of these lines."); N.T. Hearing, 3/30/22, at 291 ("THE COURT: "Did you check the SURE system before the hearing? [Counsel for Objectors]: We did. We've looked at every signature line, Your Honor.")). Moreover, Objectors highlight that, ultimately, as a result of the meet and confer session, and their own follow-up review of some of the signature lines on the SURE system, they and Candidate reduced the number of outstanding challenges, and stipulated on the record at the hearing that 239 signatures were valid and 148 were invalid. *Id.* at 27.

Objectors acknowledge that they withdrew 112 additional challenges during the hearing; however, they argue that this does not indicate that those challenges had no basis in law or fact, as the court below found. To the contrary, Objectors explain they did so "based upon rulings made by the Commonwealth Court during the course of [the] hearing on similar challenges . . . . Thus, rather than belabor the same legal questions repeatedly, Objectors withdrew numerous challenges that were effectively resolved by the Commonwealth Court's legal rulings on similar signatures as the hearing progressed." *Id.* at 27-28. Objectors add that, during the course of the hearing, Candidate conceded the invalidity of 31 signatures which he had previously defended as valid.

Objectors cite as an example of valid reasons for withdrawing certain challenges their withdrawal of signature challenges based on legibility grounds, because they were previously unable to discern the handwritten name or address of the voter on the nominating petition, and, thus, were unable to identify that person on the SURE system prior to the hearing. However, they point out that, at the hearing, often in response to the court's direction, the SURE system operator entered multiple possible combinations of names and addresses based on the court's or the parties' suggested interpretation of the

handwriting. Objectors aver that, "once the voter was located, [they] appropriately withdrew the challenge." *Id.* at 29.

Objectors also highlight that the court indicated it would not invalidate signature lines based on facial invalidity challenges such as signature mismatch, use of initials, or printed signatures absent the testimony of a handwriting expert,[19] and, further note that the court was not going to require Candidate to provide evidence, such as voter testimony, to rehabilitate challenged signatures, the lack of which the court found implicated due process concerns.

Objectors emphasize that these withdrawals did not establish the challenges had no basis in law or fact, that they failed to previously review the challenged signatures in the SURE system, or that they agreed there was no basis for the initial challenge, as the court found. To the contrary, Objectors maintain that their "withdrawals were good faith attempts to narrow the issues for decision in light of new information and streamline the hearing given the Commonwealth Court's repeated complaints about the length of the proceedings." *Id.* at 31 (quoting, *e.g.*, N.T., 3/30/22, at 443 ("And I'm not going to stay here until midnight tonight"); *id.* at 484 ("I'm not staying here until, you know, 10:00 o'clock, midnight to get through this. Can you go -- if you tell the Court you can zip through these,

---

[19] Objectors observe that the Commonwealth Court had not previously required expert testimony in ruling on signature challenges and has, instead, relied on its own visual comparison of signatures against voter registration cards. Objectors Brief at 30 (citing *In re Petition of Thompson*, 516 A.2d 1278, 1283 (Pa. Cmwlth. 1984) ("After careful examination and close scrutiny, the Court is of the opinion that by a comparison of the signature on the registration card with the signature on the nominating petition, nineteen of the signatures are not genuine and were in fact placed on the respondent's nomination petition by persons other than the registered voters whose signatures they purport to be.")).

we'll do it.")).  Objectors aver that, in sum, the majority of the signatures they withdrew — 61 — were after Candidate had passed the 1,000-vote signature mark, but the court, in conjunction with Candidate, agreed to continue.  Objectors Brief at 31.

Objectors point out that, even if their withdrawals of signature challenges could somehow be construed as concessions that no objection to those signatures should have been made  — which, again, they deny — Candidate had only 985 valid signatures after these withdrawals, not 1,000 as the court found.

Objectors note that the court could support its tally of 1,009 valid signatures only by incorrectly concluding that Objectors should have known that 48 of their IHA challenges would result in "at least 24 of these signatures [being] valid, because where there are two lines filled out in the same handwriting, one of those two lines would be valid."  *Id.* at 32 (quoting *Doyle I, slip op.*, at 31).  Objectors argue that this assumption was unwarranted, given that, in addition to IHA challenges to pairs of signature lines, they also challenged more than half of those individual signature lines on other grounds, such as that there was no registered Republican in the SURE system associated with the name on the petition, that the signatures were duplicates, that the signature and registration cards were a mismatch, or that the handwriting of the signatures or other information on the petition did not match the handwriting in the printed box on the petition, indicating one person signed it and another printed the required information.  Objectors contend that, if both signatures in a signature pair challenged on IHA grounds were stricken on these alternative grounds, *none* of the signatures would have counted, so the court erred in assuming that at least one of the signatures in the challenged pairs would always be counted.

Lastly, Objectors aver that their conduct was not "dilatory or obdurate." Objectors Brief at 36. Although acknowledging that our Court has never precisely defined those terms, they contend the widely accepted meaning of the term "dilatory," as reflected in Black's Law Dictionary, is "designed or tending to cause delay," *id.* (quoting "dilatory" in Black's Law Dictionary (11th ed. 2019) (Westlaw)), and "obdurate" as defined by Webster's dictionary is "stubbornly persistent in wrongdoing," *id.* (quoting Merriam-Webster, https://www.merriam-webster.com/dictionary/obdurate). Objectors argue their conduct in this litigation meets neither of those two definitions, given that the record reflects that they sought to expedite the hearing in the Commonwealth Court, and that "far from 'stubbornly persisting' in pressing their already-rejected legal arguments, [they] *withdrew* challenges to expedite proceedings rather than belabor the same legal questions repeatedly." *Id.* at 37 (emphasis original).

In response Candidate first contends that the evidence of record supports the court's findings that Objectors' conduct in filing the Petition was arbitrary since it had no basis in law or fact. Candidate avers that this was established by the fact that Objectors eventually conceded that the Petition had over 1,000 valid signatures.

Candidate denies that the accelerated time frames we established in *Carter* relieved Objectors of their duty to ensure that their signature challenges had a sufficient factual and legal basis. Candidate reiterates that Objectors' concessions before and during trial that Candidate had over 1,000 valid signatures supports the lower court's conclusion that Objectors "filed their petition well beyond the point where they had any prospect of succeeding." Candidate Brief at 27 (quoting *Doyle II*, slip op. at 7 n.7). Moreover, Candidate proffers that our Court's order in *Carter* did not alter the 7-day time

period afforded by the Election Code for filing objections to nominating petitions, and thus did not absolve Objectors of their duty not to file such a petition lacking a sufficient factual or legal basis.

Candidate further contends, in this regard, that if Objectors were unprepared to proceed, they should not have sought to expedite these proceedings. He avers that our Court's order in *Carter* was "an unavoidable adjustment intended to accommodate the entities responsible for administering elections . . . [,] not a right of expedited hearing granted to those seeking to interfere with the nomination of congressional candidates." *Id.* at 33. Candidate asserts that, because Objectors chose to seek an expedited hearing, they cannot avoid the consequences of doing so, and, in any event, he quotes the court denying that it would punish Objectors for seeking an expedited resolution:

> This is a matter which was expedited after it was scheduled for next week. And it was at the request of the Objectors.
>
> But the problem is that we are dealing with some very tight deadlines via the election code and the Supreme Court's schedule and getting ballots out to people, military et cetera. So some form of expediting this was necessary. I don't want to penalize the party just for that.

N.T., 3/29/22, at 13-14; Candidate Brief at 34.

Candidate continues that, because Objectors withdrew certain signature challenges, they are now foreclosed from essentially relitigating questions of their validity. Additionally, Candidate asserts that Objectors do not support their claim that they withdrew the challenges in response to rulings of the court on similar challenges because they did not cite to any specific instances in which they stated on the record they were

doing so for that reason.  Candidate maintains that, to the contrary, these challenges were withdrawn because they were shown to be "baseless."  *Id.* at 37.

For instance, Candidate claims that 42 of the challenges based on signature illegibility, or because they did not match the voter registration information in the SURE system, were withdrawn after the elector's voter file was found in the SURE system, often without any search prompts being given by the court or the parties.  *Id.* at 38, 40.  Other challenges based on flipped signatures (where the voter signed in the area of the petition for printed information and printed information in the signature area) were withdrawn on the basis of Candidate's citation to *In re Thompson*, No. 500 C.D. 2014 (Pa. Cmwlth. filed April 8, 2014), and, thus, represented a concession by Objectors that this specific challenge had no merit.

Candidate notes that in many instances no reason was given for the withdrawal of a challenge, so, in his view, this supported a finding that there was no basis for the challenge.  Regarding some of the facial validity challenges involving use of an initial, Candidate claims they were rejected by the court based on its own visual inspection in which the court claimed that it "had no difficulty" determining the identity of the signer, that the signer was a registered elector, the signature did not contain an initial, or that the signature was genuine.  Candidate Brief at 43 (citing *Doyle I*, slip op. at 26-27).  Thus, Candidate reasons that Objectors should have known that these challenges were meritless.

Candidate also disputes Objectors' contention that their withdrawal of challenges after it was determined that he had exceeded the 1,000-valid signature requirement demonstrated their intent to expedite the proceedings.  Candidate notes that the court

had already ruled that some of those challenges, based on instances where the candidate printed their full name but rendered a signature using initials or a truncated version of their name, was not a defect that was sufficient to invalidate a signature line. Yet, Candidate argues, "Objectors continued to present their case on each such objection— as was their right," *id.* at 44, and pressed on with other challenges that Candidate claims Objectors should have known were meritless, for example, where the voter signed well outside of the box on the petition, or used improper abbreviations for required address information. Candidate also defends the court's inclusion of 24 of the 48 signatures challenged on IHA grounds on the basis of his assertion that those signatures were challenged *only* on IHA grounds, not on other grounds as Objectors claim. In sum, according to Candidate, Objectors "knew or should have known that even if they succeeded on every claim they pursued, [Candidate] would have finished with approximately 1,023 signatures." *Id.* at 48.[20]

---

[20] Objectors respond to these arguments by highlighting the fact that they withdrew challenges to many signature lines only after voter registration information was found for the first time at the hearing in the SURE system, something Candidate acknowledged. Moreover, they point out that many of their legibility challenges were based on the fact that "they were unable to make out enough details to identify the voter prior to the hearing." Objectors Reply Brief at 22. Additionally, they point out that, in many instances, despite the attempts of the court to categorize signatures as obviously valid, it took multiple attempts by the SURE system operator to find a valid registered voter. *Id.* at 22-23 (citing N.T., 3/29/22, at 122-23). As for flipped printed information and signature information, Objectors observe that the case cited by Objectors for the first time at the hearing, *In re Thompson*, was unpublished and non-precedential; however, they withdrew the challenges based on their desire to not "litigate the issue on the fly." *Id.* at 24. Even so, they deny this was a concession that the initial challenges were frivolous, citing *In re Flaherty*, 770 A.2d 327, 333 (Pa. 2001) (holding that printed name on petition is not to be construed as a signature, absent substantial proof the person intended it to be such); thus, they aver they had a good faith basis to contend that the printing in the signature boxes were not valid signatures. Regarding the IHA challenges, once more Objectors dispute Candidate's assertion that the 48 challenged signature pairs were solely (continued…)

Candidate also defends the Commonwealth Court's finding that Objectors' conduct was vexatious. While conceding that the court did not expressly make a finding that Objectors filed their petition for the sole purpose of causing annoyance, as required by *Thunberg*, such a conclusion is nevertheless supported by "its finding that the petition was frivolous, stood no chance of success, and cost a considerable amount of human and monetary resources." *Id.* at 49. In Candidate's view, this demonstrated that "[t]he only objective accomplished by Objectors was to annoy all participants." *Id.*

Candidate also contends that the record supports the court's conclusion that suit was filed for an improper purpose and, thus, in bad faith. While acknowledging that the court erred in concluding that Objector Sloss had changed his party registration from Democratic to Republican, Candidate nonetheless contends that the court was correct in recognizing the effect of his last-minute change of address, namely, that it "reflected a motive to deprive the Republican party of a candidate it could nominate in the 2022 General Election." *Id.* at 56. This subjective intent may not be relevant to a standing analysis, as our Court found in *In re Samms*, but Candidate proffers it does demonstrate that Objectors' actions were in derogation of what the challenge process is intended and designed to accomplish: "a good faith review of nomination petitions to secur[e] the probity of the electoral process." *Id.* at 57.

Candidate also claims that, even putting aside the issue of the alleged motive of Objectors in filing the Petition focused on by the court and highlighted by Objectors, the

---

challenged on IHA grounds. They reiterate that they advanced other challenges to the individual signatures as well which, had they been upheld, would have invalidated both signatures.

remainder of the court's findings enumerated in its June 23, 2022 opinion, *see Doyle II*, slip op. at 10-11, sufficiently support the court's conclusion.

Lastly, Candidate claims the record supports the court's conclusion that Objectors acted in a dilatory and obdurate fashion because they did not withdraw all of their challenges at the first opportunity and, instead, forced the Commonwealth Court to spend two full days until almost 10:00 p.m. reviewing them. Candidate Brief at 59. Candidate cites additional examples of conduct which he claims was dilatory and obdurate, such as Objectors filing a case management report at the start of the hearing rather than a joint stipulation, forcing the court to read the stipulations into the record in a line by line fashion which took "over an hour of the [c]ourt's time," *id.*, as well as failing to supply the court with a thumb drive containing its excel spreadsheet of objections. Candidate avers that the net result of Objectors' actions was that he and the court were forced to expend valuable time examining the information on the SURE system and the nominating petitions which should have been done before the hearing.[21]

## IV. Discussion

Our review of a lower court's order awarding counsel fees involves determining whether the court "palpably abused its discretion" in making such an award. *Thunberg*, 682 A.2d at 299. As we have oft stated: "[a]n abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the

---

[21] Objectors acknowledge that they did not file a formal joint stipulation as required by the scheduling order, but rather the aforementioned case management report. They assert they did so only because the sudden change of the hearing date by the court to the next morning precluded the preparation and filing of a stipulation within the three-business-day period before the hearing as required by the court's scheduling order. Additionally, Objectors point out they provided a thumb drive to the court after the hearing and before it had finalized its opinion. Objectors Reply Brief at 29-30.

judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused." *In re Farnese*, 17 A.3d at 367. If the record furnishes sufficient evidence to support the court's findings of fact that a litigant violated the conduct provisions of the relevant statute or statutes under which it awarded counsel fees, the award will not be disturbed on appeal. *Thunberg,* 682 A.2d at 299*.*

As indicated, the two statutory provisions on which the Commonwealth Court relied to award counsel fees are 42 Pa.C.S. § 2503(7) and (9), which provide:

> The following participants shall be entitled to a reasonable counsel fee as part of the taxable costs of the matter:
>
> * * *
>
> (7) Any participant who is awarded counsel fees as a sanction against another participant for dilatory, obdurate or vexatious conduct during the pendency of a matter.
>
> * * *
>
> (9) Any participant who is awarded counsel fees because the conduct of another party in commencing the matter or otherwise was arbitrary, vexatious or in bad faith.

42 Pa.C.S. § 2503 (7), (9).

As a general matter, as our Court has explained recently, conduct by a party is considered dilatory within the meaning of Section 2503(7) "where the record demonstrates that counsel displayed a lack of diligence that delayed proceedings unnecessarily and caused additional legal work." *County of Fulton v. Secretary of the Commonwealth*, 292 A.3d 974, 1062 (Pa. 2023). Obdurate conduct under this statutory provision is when counsel stubbornly persists in a course of wrongdoing during the course of the litigation. *Id.*

Additionally, under Section 2503(9), a litigant is deemed to have acted vexatiously if he brought a legal action "without sufficient grounds in either law or in fact *and* if the suit served the sole purpose of causing annoyance." *Thunberg*, 682 A.2d at 299 (emphasis added). As our Court subsequently underscored, a court which finds that a suit was brought "vexatiously" under this statutory provision must have also made a specific finding that the suit was brought with the "sole purpose of causing annoyance," and articulated its reasoning for this conclusion. *Old Forge*, 924 A.2d at 1213.[22] Lastly, under Section 2503, a party will be found to have commenced a suit in bad faith if he filed it "for purposes of fraud, dishonesty, or corruption." *Thunberg*, 682 A.2d at 299.

In accordance with these principles, we must determine whether the record in this matter provides sufficient evidence to support the court's findings of fact, enumerated in its June 23, 2022 opinion, in support of its conclusion that Objectors' conduct in bringing and pursuing this litigation satisfied Sections 2503(7) and (9). *See Doyle II*, slip op. at 10-11 (concluding that Objectors engaged in "dilatory, obdurate, and vexatious conduct and bad faith during the pendency of and in commencing this matter").

The court's first finding was that "Objectors did not have a reasonable factual or legal basis to file the petition to set aside." *Id.* at 10. This was the equivalent of a finding that the Objectors' initial decision to file the Petition was "arbitrary," as that term is used in Section 2503(9) - that is, "based on random or convenient selection or choice rather than on reason or nature." *Thunberg*, 682 A.2d at 299; *see also id.* at 301 ("By definition, where there is no basis in law or fact for the commencement of an action, the action is

---

[22] The Commonwealth Court did not make such a finding in its opinion in this matter.

arbitrary."). As we made clear in *Thunberg*, however, such a finding will be justified only if the allegations made in the complaint are "wholly unsubstantiated." *Id.*

In regard to petitions to set aside a candidate's nominating petitions under the Election Code, our Court has reminded:

> [R]equirements as to form and contents of nomination petitions are "not mere technicalities but are necessary measures to prevent fraud and to preserve the integrity of the election process." The ability of a party to object to nomination papers when requirements are not met "provides an important check on the nomination process."

*In re Farnese*, 17 A.3d at 372 (citations omitted). Further, we cautioned therein that courts, in assessing a party's decision to file such a petition, must be cognizant of the fact that "prospective objectors often have a limited opportunity for extensive investigation of signatures prior to expiration of the period for forwarding objections. Thus, objectors often must determine whether to proceed at a point where the prospect of success is uncertain." *Id.* at 373.

Here, the record reflects that, after Candidate filed his nominating petition, Objectors undertook a review of the 1,351 signature lines thereon, and, that, based on that examination, they reasonably believed that 717 of them did not conform to the legal mandates of the Election Code. Specifically, Objectors claimed that the signatures violated the requirements of 25 P.S. § 2868 (requiring voter to sign the petition, print his or her name, and provide his or her party affiliation and address thereon), which necessitated them being found invalid and not counted towards the 1,000-signature requirement. Petition to Set Aside Nominating Petitions of Michael Doyle, 3/22/02, at 2-3.

Our examination of the record simply does not support a conclusion that these allegations were "based on random or convenient selection or choice rather than on reason or nature," and were "wholly unsubstantiated," *Thunberg, supra*, given that the subsequent joint review of the petitions conducted by counsel for Objectors and Candidate, as well as the hearing before the court, determined that 205 of those signature lines were, in fact, invalid for the reasons Objectors cited. We cannot find that, merely because Objectors did not prevail on each and every one of the 717 initial challenges they made, their petition lacked a sufficient factual or legal basis. *Cf. In re Farnese*, 17 A.3d at 373 ("simple fact that candidate prevailed" is not a just reason for the imposition of costs on challenger); *see also Morley v. Farnese*, 178 A.3d 910, 917 (Pa. Cmwlth. 2018) (fact that challengers to nominating petition withdrew or were unsuccessful on some of their challenges to circulator affidavits and signature lines did not show that there was no valid basis to bring such challenges) (citing *In re Farnese*, 17 A.3d at 372-73). Courts are obligated to acknowledge the practical reality that the initial review process of a nominating petition relies on a visual examination of often inscrutable handwriting and printing which, unsurprisingly, can yield multiple, reasonable interpretations. Thus, a party challenging a nominating petition is not required to possess certitude of the outcome of his challenges in order to avoid the severe penalty of payment of counsel fees if he is ultimately unsuccessful; rather, the challenger must, at the time of filing the petition, possess a good faith factual and legal basis to conclude that the candidate's nominating petition lacks the sufficient number of legally valid signatures required under the Election Code. We conclude that the record in this matter simply does not establish that Objectors lacked such a good faith basis to file their petition.

The second finding of fact the court made to support its award of counsel fees was that "Objectors failed to comply with this Court's direction that they adequately review the SURE System and advise candidate's counsel of the necessary withdrawal of invalid challenges, and ended up withdrawing over 100 challenges in open court in addition to the 239 challenges withdrawn as the result of pre-trial stipulations." *Doyle II*, slip op. at 10. Once more, the record does not support the court's finding in this regard.

As recounted above, even counsel for Candidate acknowledged at the hearing that the parties' pretrial meet and confer session ordered by the court had taken place and that they had jointly reviewed the SURE system information during that session. *See supra* note 4 and accompanying text. Indeed, by counsel for Candidate's own recollection, the parties jointly reviewed almost *all* of the signature lines on the petition during that session — nearly 1,300. *See* N.T., 3/29/22, at 197. Moreover, the record also establishes that, after this session ended, counsel for Objectors continued to review the SURE system information on his own with respect to signatures that he had indicated he would follow up on, and, based on that independent review, Objectors withdrew an additional 150 challenges prior to the start of the hearing. *Id.* at 53-54. In our view, then, the court's conclusion that Objectors subsequent decision to withdraw some of their remaining objections during the hearing was due to a failure to comply with its order to review the challenged signatures in the SURE system prior to the hearing is altogether unsubstantiated.

The court's next finding of fact in support of its decision to award counsel fees was that "Objectors ultimately conceded that over 1,000 signatures were valid, which meant Candidate had more than enough valid signatures to remain on the ballot and indicated

that no objection should have been made to these signatures." *Doyle II*, slip op. at 10. In essence, the court treated Objectors' decision to withdraw objections at the hearing, after additional information was adduced therein by the SURE system operators, and after the court made rulings on similar objections earlier during the hearing, as a *de facto* admission by Objectors that they had no basis to bring the objections in the first place. This novel proposition has been rejected previously by the Commonwealth Court, *see Morley*, *supra*, and it finds no support in our caselaw. Moreover, the factual record in this matter does not support such a finding.

To the contrary, the record supports the conclusion that Objectors' decision to withdraw objections at the hearing was their reasonable response to events that transpired therein. For instance, many of the objections that were withdrawn pertained to illegible voter information, such as the signature and address, which precluded the validity of the voter's registration from being confirmed in the SURE system prior to the hearing. Objectors were not required to abandon such objections at the hearing, as they had a good faith basis to pursue them. *See, e.g., In re Gales*, 54 A.3d 855, 859-60 (Pa. 2012) ("[W]here it is not obvious that the signature on the nomination petition reflects the same name that appears on the elector's voter registration card, absent other evidence, the signature should be stricken."); *In re Flaherty*, 770 A.2d 327, 332-33 (Pa. 2001) ("[A]n elector who prints her name on a nomination petition has not properly signed the petition, as required by the plain language of . . . 25 P.S. § 2868." (footnote omitted)). On this

record, Objectors were entitled to receive a definitive resolution of these challenges through the judicial process.[23]

As related above, during the hearing, the SURE system operators were ultimately able to confirm the registration information for these challenged signature lines, but often only after they performed multiple searches using different criteria as directed by the court or counsel. Once this registration information was confirmed, and a valid voter registration card found and displayed, then, lacking any further basis to pursue the challenge, Objectors withdrew their objection. Such a withdrawal at that point in time, as Objectors correctly perceived and explained to the court when it complained of some of the withdrawals, was required by their duty of candor to the tribunal. N.T., 3/30/22, at 291.

Further, the record supports Objectors' assertion that their decision to withdraw other challenges to signatures based on facial invalidity was based on the court's rulings regarding similar objections, and to accommodate its wishes to have the hearing conclude at what it deemed a reasonable hour. Although the court did not explicitly rule that expert testimony was required to prevail on such a challenge, the court nevertheless expressed skepticism about being able to make such an assessment without it. *Id.* at 103. Moreover, and most importantly, the court, while not expressly endorsing Candidate's argument that due process required he be given the opportunity to confirm signatures challenged on this basis through the introduction of rehabilitative evidence, nevertheless rejected the majority of these challenges in whole or in part on the basis of due process,

---

[23] It is noteworthy in this regard that, when it ruled on these challenges, the court had the benefit of viewing the original filings in its possession, which it admitted were "clearer" than the copies relied on by Objectors in preparing their Petition. N.T., 3/29/22, at 121.

prior to the Candidate having established that he possessed 1,000 valid signatures. *Id.* at 213-43; N.T., 3/30/22, at 262-297. Thus, given this pattern of adverse rulings, and the court's stated desire to bring the hearing to a close as rapidly as possible, it was not unreasonable for Objectors to withdraw the majority of those remaining unresolved objections after Candidate reached the required 1,000 vote threshold.

Finally, we reject the court's conclusion, endorsed by the Candidate, that Objectors' bad faith in commencing this challenge was evidenced by the fact that they were motivated to do so in order to deprive the Republican Party of a candidate it could nominate for the 2022 General Election. As we have previously held in *In re Samms*, an individual's motivation in bringing a challenge to a nominating petition is wholly irrelevant to their right to do so. Consequently, given that a registered voter of a political party has an unqualified right to bring such an action, for any reason, by virtue of their status as a member of that political party, Objectors' decision to commence this action, in and of itself, cannot be deemed to be bad faith, regardless of the ultimate outcome of that legal process.

Furthermore, the court, in concluding that Objectors were acting in bad faith, assigned great weight to its finding that one of the Objectors switched parties solely for the purpose of challenging Candidate's nominating petition. *Doyle II*, slip op. at 11. However, as discussed above, this finding was plainly erroneous, and there is no evidence in the record to support the court's conclusion that Objectors' intent in filing this petition was to deprive the Republican Party of a candidate it could nominate for the 2022 General Election.

In this regard, we reiterate the foundational principles we emphasized in our decision in *In re Farnese* that "[r]equirements as to form and contents of nomination petitions are not mere technicalities but are necessary measures to prevent fraud and to preserve the integrity of the election process. The ability of a party to object to nomination papers when requirements are not met provides an important check on the nomination process." 17 A.3d at 372 (citations and internal quotations omitted).

## V. Conclusion

The Commonwealth Court's factual findings in support of its decision to award counsel fees under 42 Pa.C.S. §§ 2503(7), and (9) are lacking in record support, and, thus, its determination that Objectors' conduct in commencing and pursuing this litigation was dilatory, obdurate, vexatious, and in bad faith was unfounded. We therefore conclude that the Commonwealth Court abused its discretion in making such an award and, accordingly, reverse the portion of the Commonwealth Court's order of June 23, 2022 directing Objectors to pay such fees.

Jurisdiction relinquished.

Justices Wecht, Mundy and Brobson join the opinion.

Justices Donohue and Dougherty did not participate in the consideration or decision of this matter.